**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JUDSON ANDERSON, Individually and On Behalf of All Others Similarly Situated, | Civ. A. No. 2:16-cv-06111-ER |
| Plaintiff, | |
| vs. | Complaint -- Class Action |
| STONEMOR PARTNERS L.P., STONEMOR GP, LLC, STONEMOR GP HOLDINGS, LLC, AMERICAN CEMETERIES INFRASTRUCTURE INVESTORS, LLC, LAWRENCE R. MILLER, SEAN P. MCGRATH, ROBERT B. HELLMAN, JR., WILLIAM R. SHANE and TIMOTHY YOST, | |
| Defendants. | **JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ................................................................................................. i

NATURE OF THE ACTION ......................................................................................... 2

    A.    Defendants Structured StoneMor as a Cash-Distribution Machine that Primarily Benefitted Themselves ............................................................. 3

    B.    In Reality StoneMor Was Severely Cash-Strapped ................................. 4

    C.    Non-GAAP Accounting Provided a Perfect Cover for Defendants' Fraudulent Scheme ................................................................................ 5

    D.    Despite StoneMor Being Cash-Strapped, Defendants Continued to Pay Substantial Distributions, Simultaneously Filling Their Own Wallets .................. 6

    E.    When the House of Cards Collapsed, StoneMor's Investors were Severely Harmed ...................................................................................... 7

JURISDICTION AND VENUE ..................................................................................... 8

PARTIES ....................................................................................................................... 8

SUBSTANTIVE ALLEGATIONS ............................................................................... 16

    A.    StoneMor's Business .............................................................................. 16

        1.    StoneMor's MLP Structure Made Distributions the Key to Investors ................................................................................... 17

            (a)    StoneMor's Unique Structure Funneled Borrowed Cash to Investors and Defendants StoneMor GP, Miller, and Hellman .................................................................... 18

            (b)    StoneMor's Numerous Public and Private Offerings of Common Units Significantly Increased the Scale of the Company's Cash Distributions ....................................... 19

        2.    StoneMor Spent to Expand Pre-Need Sales Through Property Acquisitions ........................................................................... 21

    B.    StoneMor Relied Upon Non-GAAP Financial Accounting to Create the Appearance of a Company with Revenues Substantially Higher than Those Actually Earned through Business Operations ......................................... 24

        1.    StoneMor's Pre-Need Sales Require Particular Accounting Treatment ................................................................................ 25

2.      StoneMor Included Inaccessible Merchandise Trust Assets in its "Distributable Available Cash Flow" ...................................................... 26

3.      Defendants Regularly Told Investors that StoneMor's Quarterly Non-GAAP Accounting was a More Accurate Representation of the Company's Cash Flows ...................................................................... 29

C.     StoneMor Could Not Pay its Cash Distributions from Cash Flows from Operations ............................................................................................................ 32

1.      StoneMor Fueled its Cash Distribution Machine Indirectly by Proceeds from Equity Offerings ..................................................... 32

2.      Observations of Former StoneMor Executives and Employees Corroborate StoneMor's Precarious Financial Position throughout the Class Period.......................................................................................... 37

D.     StoneMor's Reliance on the Capital Markets to Fund its Cash Distributions Was Unsustainable.............................................................. 41

E.     The Announcement of the Intention to Restate Impairs StoneMor's Access to the Capital Markets ................................................................................. 43

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...............................................46

A.     2011 Form 10-K, Earnings Call, and Press Release ........................................... 46

B.     Q1 2012 Form 10-Q, Earnings Call, and Press Release ..................................... 48

C.     September 2012 Distribution Increases ..................................................... 49

D.     Q3 2012 Form 10-Q, Earnings Call, and Press Release ..................................... 50

E.     Spring 2013 Offering and Increased Distribution................................................. 51

F.     Q1 2013 Form 10-Q, Earnings Call, and Press Release ..................................... 52

G.     May 2013 Increased Distribution.................................................................... 53

H.     Q2 2013 Form 10-Q, Earnings Call, and Press Release ..................................... 54

I.      November 2013 Investor Day ........................................................................... 55

J.      February 2014 Public Offering .......................................................................... 57

K.     2013 Form 10-K, Earnings Call, and Press Release ........................................... 59

L.     May 2014 Public Offering ................................................................................. 60

M.      June 2014 Increased Distribution.................................................................. 61

N.      Q2 2014 Form 10-Q, Earnings Call, and Press Release ....................................... 62

O.      November 2014 Investor Day ..................................................................... 63

P.      Q1 2015 Form 10-Q, Earnings Call, and Press Release ....................................... 64

Q.      July 2015 Public Offering .......................................................................... 64

R.      Q2 2015 Form 10-Q, Earnings Call, and Press Release ....................................... 65

S.      November 2015 Investor Day ..................................................................... 67

T.      November Announcement of Equity Agreement ............................................... 68

U.      April 2016 Public Offering ......................................................................... 69

V.      Q1 2016 Form 10-Q, Earnings Call, and Press Release ....................................... 69

W.      June 2016 Investor Conferences ................................................................. 70

X.      Announcement of the Intention to Restate...................................................... 73

Y.      False and Misleading Certifications.............................................................. 73

THE TRUTH EMERGES .......................................................................................77

ADDITIONAL INDICIA OF SCIENTER .................................................................79

A.      Defendants Controlled the Public Equity Offerings ........................................... 80

B.      Defendants' Statements Support a Strong Inference of Scienter........................... 81

C.      Motive and Opportunity............................................................................ 84

D.      Former Executives' and Employees' Testimony Supports a Strong
        Inference of Scienter ................................................................................ 85

E.      Corporate Resignations and Retirement ....................................................... 85

F.      Core Operations Doctrine ......................................................................... 87

LOSS CAUSATION AND ECONOMIC LOSS ...........................................................88

INDIVIDUAL DEFENDANT AND CONTROLLING PERSON ALLEGATIONS.................90

PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET..................................96

NO SAFE HARBOR; BESPEAKS CAUTION IS NOT APPLICABLE ....................................97

CLASS ACTION ALLEGATIONS ...............................................................................98

COUNT I Defendants StoneMor, Miller, Shane, Yost, and McGrath Violated Section
10(b) of the Securities Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder ...........101

COUNT II Defendants StoneMor GP, GP Holdings, ACII, and the Individual Defendants
Violated Section 20(a) of the Securities Exchange Act ...............................................102

PRAYER FOR RELIEF ........................................................................................104

DEMAND FOR TRIAL BY JURY ..........................................................................105

Plaintiffs Peter Fan, Royal Estate Management, LLC, and Fremont Hotel, Inc. (collectively, the "Freemont Investor Group," or "Plaintiffs" ), individually and on behalf of all other persons and entities that, during the period from March 15, 2012 through October 27, 2016, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common units of StoneMor Partners L.P. ("StoneMor" or the "Company") and were damaged thereby (the "Class"), by their undersigned attorneys, allege in this Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

Plaintiffs' information and belief concerning matters other than themselves and their own acts are based upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by StoneMor with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of StoneMor's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) data and other information concerning StoneMor securities and the regulations under which StoneMor operates; (e) other publicly available information concerning the Company and the Individual Defendants; (f) an investigation conducted by and through Plaintiffs' attorneys and their investigators, including but not limited to interviews and discussions with former StoneMor employees; and (g) consultation with industry experts in accounting.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This case presents the story of the General Partners of a Master Limited Partnership who throughout the Class Period did whatever they could to ***create the appearance*** that they were economically able to meet their ***primary corporate purpose***:  the regular, quarterly distribution of most, if not all, of its "available cash" to the holders of its publicly-traded limited partnership "units."

2.      Unbeknownst to investors, however, throughout the Class Period, StoneMor was severely cash-strapped, and was able to pay these distributions only through an elaborate financial ruse. Indeed, through a highly-complex system of accounting and reporting—the scope and interconnecting aspects of which were hidden from the investing public through a series of misstatements and omissions—Defendants obscured the fact that the Company paid the distribution from its revolving credit facility, which was in turn paid down through the proceeds of a series of equity offerings. By way of analogy, it was if the Company was nearly maxing out its credit cards every quarter to pay cash distributions to investors, and then immediately paying down the balance using new infusions of investor cash—only to repeat the cycle in time to make the next cash distribution.

3.      Additionally, the sleight of hand was furthered by reliance on arcane, non-GAAP[1] accounting methods and presentation, designed to give the appearance of a tremendous surplus of available cash to fund the quarterly distributions. Needless to say, this apparent cash surplus existed only in Defendants' unique, and self-defined, non-GAAP world.

---

[1] Accounting methodology outside the parameters of Generally Accepted Accounting Principles ("GAAP").

4.     When this (hidden) house of cards collapsed, as it was bound to do from day one, StoneMor's share price plummeted by ***nearly 45%***, wiping out nearly half of its market cap in one dramatic drop.

**A.     Defendants Structured StoneMor as a Cash-Distribution Machine that Primarily Benefitted Themselves**

5.     StoneMor is organized as a Master Limited Partnership ("MLP"), a unique corporate structure, whereby the Company is contractually required to distribute all of its available cash to its limited partners, called unitholders, on a quarterly basis. The Company is entirely controlled and operated by its General Partner, StoneMor GP, which ***receives an incrementally higher proportion of each quarterly distribution*** depending on the amount of the distribution. The higher the distribution per unit, the greater proportion of the quarterly distribution StoneMor GP receives. Failure to make the distributions would not only hurt the unitholders, and indeed, the Company, but would also directly impact Defendants' ability to generate the quarterly windfalls they enjoyed throughout the Class Period.

6.     Under this corporate structure, it was in StoneMor GP's financial interest to ensure that the quarterly distributions were as high as possible, ***regardless of whether StoneMor could afford to pay them from cash generated by its business operations***. Amplifying this perverse arrangement, Defendant Hellman, through his "exclusive voting and investment power over approximately 67.03% of membership interests in [StoneMor GP]," along with Defendants Miller and Shane, as well as several other Defendants who held the remainder minority interest in StoneMor GP, were at all times ***in control of all the major corporate decisions of StoneMor and StoneMor GP <u>and</u> together possessed more common units than any other investor***. Therefore, Defendants alone decided whether or not they received millions of dollars each and every quarter. This unbridled power essentially allowed Defendants to funnel money from

unknowing new investors into their own pockets. Indeed, allegations from multiple former StoneMor executives and employees confirm that Hellman was constantly pressuring the Company's executives to "raise distributions."

7.     Sure enough, throughout the Class Period, StoneMor and the Individual Defendants regularly distributed a substantial, and increasing, cash distribution to unitholders. They rationalized and explained these distributions by directing investors to manufactured, non-GAAP financial measures. These non-GAAP financials created the appearance of a cash-rich, sustainable "death-care company" (as Defendants described it) that was generating huge sums of revenue and cash flow from operations to support payment of the sizable cash distributions.

8.     Indeed, at various times during the Class Period, Defendants told investors and analysts that the "***primary source of cash*** from which to ***pay partner distributions*** and make routine capital expenditures is ***operating cash flow***," that they "***determine the distribution*** based on the ***operating performance of the company*** and the ***resultant Available Cash*** at the end of the quarter," and explained that an announced increase in the distribution was "a testament to ***the strength of our underlying business***."

**B.     In Reality StoneMor Was Severely Cash-Strapped**

9.     The reality, however, could not have been farther from the glossy story presented to the public. In fact, the Company was constantly cash-strapped and actually generated only a small fraction of the revenue needed to pay the cash dividends it promised.

10.     Former StoneMor employees corroborate that StoneMor was doing everything it could just to continue its day-to-day-operations. Several employees recalled the Company aggressively "pre-installing" customers' crypts and grave markers before the customer died, just so the Company could immediately access the cash that was locked away in statutorily protected

4

trusts. Likewise, in June 2016, StoneMor forced a majority of its employees to take a mandatory furlough without pay. There are also accounts of cemetery maintenance cuts, past due credit card bills, and rampant contract backdating.

## C.   Non-GAAP Accounting Provided a Perfect Cover for Defendants' Fraudulent Scheme

11.     StoneMor's purported business plan was aggressively to acquire cemeteries and immediately build a "pre-need" sales program by vigorously selling to customers who were still alive but wanted to pre-arrange their own funeral and cemetery arrangements. To protect these customers, however, most states have passed burdensome trusting regulations that require companies like StoneMor to keep a majority of the total pre-need sales proceeds in a trust until they perform the actual burial services. In effect, StoneMor could not access most of the actual cash from a pre-need sale under GAAP until the person died.

12.     While this created a vast disconnect between sales and cash coming in the door, StoneMor told investors that this apparent inability to access most of their cash was superficial and irrelevant to their ability to pay quarterly distributions. Instead, StoneMor told investors to rely on non-GAAP figures that StoneMor itself created because it was the only way to fairly assess the Company's ability to pay distributions. For example, during the Company's 2015 Investor Day, Defendant McGrath told investors:

> I don't know if the SEC can get anymore screwed up with regard to revenue recognition rules. This might be a new level in terms of screwed up. So this is why we moved towards the non-GAAP. [ ... ]But we look at how we characterize our cash flow on our press release and the non-GAAP measure of it. We remove all of the arcane and bizarre deferral rules. And we try to show people exactly, "Listen, this is the activity we did during the period. This is what we generated. These are the costs associated with that." ***And that's why you can feel comfortable that we generate enough cash flow to pay a distribution in this period.***

**D.     Despite StoneMor Being Cash-Strapped, Defendants Continued to Pay Substantial Distributions, Simultaneously Filling Their Own Wallets**

13.     Contrary to every internal indication that StoneMor was running out of money and failing as a business, the Company, at Defendant Hellman and Miller's direction, not only kept paying the massive quarterly distributions, but continually raised the amount of the distributions throughout the Class Period, in effect paying themselves more and more because the higher the distributions, the more Hellman, Miller and Shane would be paid.

14.     Unbeknownst to investors, to make up the difference between *actual cash* generated from StoneMor's business, and the non-GAAP measures of *apparently available cash*, Defendants ultimately funded the distributions through the proceeds of ever-increasing equity offerings.

15.     Specifically, throughout the Class Period, StoneMor and the Individual Defendants accomplished this financial chicanery by: (1) raising nearly $330 million in seven separate equity offerings; which they then used (2) to pay down an ever-increasing debt on StoneMor's revolving credit facility; which they in turn (3) borrowed against to pay the quarterly distributions.

16.     Due to Defendants' public misstatements and omissions, however, investors and analysts remained in the dark as to this shell game. Defendants publicly acknowledged that the proceeds from the equity offerings were often used to pay down debt, but they never, at any time throughout the Class Period, corrected the previously false statements that led the public to believe that the distributions came from "operating cash flow," and reflected the "operating performance of the Company," and "the strength of [its] underlying business."   Indeed, Defendants' failure to tell the other half of their financial sleight-of-hand tale—that the proceeds from equity sales would be used to pay down debt on the revolving line of credit *which they, in*

*turn, used to pay the distributions*—was an omission of material information from StoneMor's public investors.

17.     Investors would have wanted to know, of course, that the distributions were paid using equity sales (as opposed to operating cash, as Defendants had previously stated) because of the extreme risk inherent in such a shell game, *i.e.*, that in the event the Company's access to capital markets was threatened and StoneMor could no longer rely upon that access to pay distributions, the whole house of cards would come tumbling down and the Company could not pay distributions because it was not generating cash from business operations.

18.     In fact, late in the Class Period, in the face of ever-challenging questions from analysts attempting to understand the engine that was driving StoneMor's cash distribution machine, Defendant McGrath expressly denied that StoneMor "*raise[d] equity to pay [its] distributions*" and insisted that such a suggestion "*couldn't be further from the truth*." Unfortunately for investors, the suggestion was 100% true, and McGrath's denial was an outright lie.

**E.     When the House of Cards Collapsed, StoneMor's Investors were Severely Harmed**

19.     The extreme risks inherent in Defendants' shell game that they carefully concealed from the public finally came to light with shocking speed and intensity. Following the need to restate three years of StoneMor's previous financial statements due to a weakened control environment and resulting sloppy accounting practices, StoneMor could no longer readily access the capital markets and was effectively restricted from selling the Company's equity, and generating the debt-driven cash which was the General Partners' lifeblood.

20.     Without such access to easy cash, on October 27, 2016, Defendants were forced to cut the Company's supposedly stable and sustainable distribution *in half*. Upon learning this

news, the market immediately punished StoneMor, sending the price of StoneMor units downward by ***nearly 45%***.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the Company has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

25.     Plaintiffs, the Fremont Investor Group, consist of Peter Fan as an individual, Royal Estate Management, LLC, and Fremont Hotel. Each of these entities purchased StoneMor common units during the Class Period, as set forth in the certifications previously filed with the Court (*see* ECF No. 20-3),[2] and suffered damages as a result of the federal securities law violations alleged herein. By order dated February 21, 2017 (*see* ECF No. 64), this Court appointed Fremont Investor Group as Plaintiffs in this action.

---

[2] The Fremont Investor Group's previously filed certifications are incorporated herein by reference.

26.     Defendant StoneMor Partners L.P. ("StoneMor") is a Delaware limited partnership with its principal executive offices located at 3600 Horizon Boulevard, Trevose, Pennsylvania 19053. Incorporated in April 2004, StoneMor (which describes itself as a "death-care company") owns and operates 316 cemeteries and 100 funeral homes (as of August 15, 2016) in 27 states and Puerto Rico, making it the second largest death-care provider in the United States.

27.     StoneMor operates as a Master Limited Partnership, or "MLP" whose **primary corporate purpose** is to distribute most, if not all, of its available cash to unitholders. StoneMor is managed by the directors, officers, and employees of StoneMor GP LLC, StoneMor's General Partner ("StoneMor GP" or General Partner").

28.     Defendant Robert B. Hellman, Jr. was, at all relevant times, a Director on the Board of Directors of StoneMor GP since StoneMor was formed in April 2004. According to the Company's public filings, Hellman maintains "**exclusive voting and investment power** over approximately 67.03% of membership interests in [StoneMor GP]." Defendant Hellman is also the co-founder of American Infrastructure MLP Funds ("AIM"), an organization, which is part of a larger group of entities,[3] led by Defendant American Cemeteries Infrastructure Investors, LLC ("ACII"), that committed $130 million to the Company in 2014 which was used to acquire an indirect controlling interest in StoneMor GP.

29.     Defendant Lawrence R. Miller was, at all relevant times, Chief Executive Officer ("CEO"), President, and Chairman of the Board of StoneMor. In addition to his role as Chairman and CEO of StoneMor, Miller is a member of the board of directors of and has an ownership

---

[3] The group of entities which are all controlled by Defendant Hellman, Miller and Shane are described in detail in ¶¶ 249-265, *infra*.

interest[4] in StoneMor GP, the General Partner that holds 100% of StoneMor's voting units and decides StoneMor's quarterly distributions to unitholders. Miller has more than 30 years of experience in the death care industry, and his relationship with Defendant Hellman in the industry dates back to at least 1999. Following the events discussed herein, on March 28, 2017, Defendant Miller announced his retirement from StoneMor.

30.    Prior to joining StoneMor, from March 1999 through April 2004, Miller served as the Chief Executive Officer and President of Cornerstone Family Services, Inc. ("Cornerstone"). Cornerstone was originally founded in 1999 by members of StoneMor's management team and a private equity investment firm, known as McCown De Leeuw, which is affiliated with Defendant Hellman. In connection with StoneMor's IPO in 2004, Miller's former employer Cornerstone contributed substantially all of its assets, liabilities and businesses to StoneMor and converted into CFSI LLC (later known as StoneMor GP Holdings LLC ("GP Holdings")), which owned StoneMor GP. In other words, the entity that was Cornerstone still effectively owns StoneMor GP.

31.    Prior to joining Cornerstone, Miller was employed by The Loewen Group, Inc. ("Loewen")   (later known as the Alderwoods Group, Inc.), where he served in various management positions, including Executive Vice President of Operations from January 1997 until June 1998, and President of the Cemetery Division from March of 1995 until December

---

[4] Miller shares a 32.97% minority ownership interest in StoneMor GP with Defendant Shane and four other former StoneMor executives. This ownership entitles Defendants Miller and Shane, as well as the other minority owners to a share of StoneMor GP's profits arising out of their increasing share of StoneMor's quarterly cash distributions. As a result, Miller and Shane were also incentivized to control StoneMor in such a way as to maximize the payments they received as minority owners by paying the highest distribution amounts possible.

1996.[5]  Prior to joining Loewen, Miller served as President and Chief Executive Officer of Osiris Holding Corporation, a private consolidator of cemeteries and funeral homes of which Miller was a one-third owner, from November 1987 until March 1995, when Osiris was sold to Loewen.

32.     Defendant William R. Shane served as StoneMor's Executive Vice President and Chief Financial Officer ("CFO") from April 2004 until April 1, 2012, when he announced his retirement as CFO. In addition, throughout the Class Period, Defendant Shane served as a member of the Board of Directors of StoneMor GP and was Vice Chairman of the Board of Directors following his retirement as CFO. As discussed above, Defendant Shane is a minority owner of StoneMor GP and is entitled to a portion of the profits paid to StoneMor GP on a quarterly business.

33.     Prior to joining StoneMor, Shane followed almost the same exact career path as Defendant Miller, only in different roles. Shane was CFO of Cornerstone from March 1999 through April 2004 and was employed by Loewen as a Senior Vice President of Finance for the Cemetery Division from March 1995 until January 1998. Prior to joining Loewen, Shane served as a CFO and vice president of various corporations and including Osiris Holding Corporation which he founded along with Defendant Miller.

34.     Defendant Timothy Yost was CFO of StoneMor from April 1, 2012 through May 13, 2015. Defendant Yost officially resigned from his position as CFO of StoneMor on May 18,

---

[5] Miller's time at Loewen appears to have been very influential on his management decisions at StoneMor. StoneMor's stated business strategy, like Loewen's, was to aggressively acquire new cemetery properties and focus on pre-need cemetery sales. Unfortunately, this strategy led to significant cash flow problems, and ultimately Loewen's bankruptcy. As discussed below, StoneMor is now experiencing the same exact cash flow problems Loewen did, suggesting that Defendants were aware of the risks that their scheme would result in significant cash flow problems and StoneMor's inability to generate enough cash to support paying the distributions from operating revenues.

2015. Prior to that, Yost was Vice President of Financial Reporting and Investor Relations from November 2004 until March 31, 2012. Prior to joining StoneMor, Yost was the CFO of various corporations and limited partnerships, with more than 20 years of experience in corporate financial management.

35.     Defendant Sean P. McGrath was CFO of StoneMor from September 28, 2015 through the end of the Class Period. Defendant McGrath tendered his resignation as StoneMor's CFO on January 23, 2017, following StoneMor's distribution cut and announcement of the restatement of their financial statements. Prior to joining StoneMor, McGrath served as the CFO and Chief Accounting Officer for a variety of organizations, including publicly traded L.P.s and MLPs as well as private LLCs. Defendant McGrath is also a Certified Public Accountant.

36.     Defendant American Cemeteries Infrastructure Investors, LLC ("ACII"), is a Delaware limited liability company with its principal executive offices located at 950 Tower Lane, Suite 800, Foster City, California, 94404. ACII controls GP Holdings through a 67.03% membership interest . ACII's acquisition of GP Holdings was first announced in May 19, 2014, when StoneMor issued a press release entitled "StoneMor Partners L.P. Announces $130 Million Commitment by Private Investment Firm."  While StoneMor does not specifically reference ACII as the private investment firm making the commitment, an in-depth analysis of StoneMor's SEC filings shows that ACII was, in fact, the entity that acquired a controlling interest in GP Holdings.

37.     In any event, and as discussed below, ACII itself is controlled, managed, and owned by a consortium of corporate entities, all of which are either directly or indirectly controlled by Defendant Hellman.

38.     Defendant StoneMor GP Holdings, LLC ("GP Holdings") is a Delaware limited liability company which wholly owns and therefore controls Defendant StoneMor GP, the General Partner of StoneMor. GP Holdings is owned by Defendant ACII through a 67.03% membership interest. Prior to Defendant ACII's acquisition of a controlling share of GP Holdings in 2014, GP Holdings was known as CFSI, LLC. CFSI was also owned and controlled by various entities the Defendants ultimately controlled.

39.     Defendant StoneMor GP, LLC ("StoneMor GP" or "General Partner"), is a Delaware limited liability company with its principal executive offices located at 155 Rittenhouse Circle, Bristol, Pennsylvania 19007. According to StoneMor's filings "StoneMor GP LLC, manages [StoneMor's] operations and activities." StoneMor GP is controlled through a complex network of shell companies and trusts, of which Defendants Hellman, Miller, and Shane (among others) are the ultimate beneficial owners. This complex network of entities obfuscates Defendants Miller's and Hellman's ultimate control of StoneMor, and the full scope of financial benefits they received from the distributions to unitholders discussed herein. The shares of ownership in StoneMor GP are held by GP Holdings. The election of StoneMor GP's Board of Directors is controlled entirely by GP Holdings.

40.      Defendants Hellman, Miller, Shane, McGrath, and Yost are referred to as the "Individual Defendants," and together with StoneMor, StoneMor GP, GP Holdings, ACII, the "Defendants."

**Relevant Non-Parties:**

41.     James Young was the owner and operator of a chain of funeral homes in Florida that was purchased by StoneMor in early 2013. Following the acquisition, StoneMor hired Mr. Young as a Regional Vice President, Funeral Division for the Florida region. Young remained in

that position from July 2013 to December 1, 2015. Young was one of four Regional Vice Presidents on the funeral side of the business, and he focused on oversight of StoneMor's funeral homes in the Company's Florida region. During his tenure at StoneMor, Mr. Young reported to Vice President of Funeral Homes, Ken Lee, who in turn reported to Defendant Miller.

42.     Following StoneMor's acquisition of Mr. Young's properties, the Company touted Young's experience and connection in the death-care industry to investors. For example, during StoneMor's Q1 2013 earnings call with analysts, Defendant Miller applauded Mr. Young's prominence in the funeral home community stating "now with the Seawinds acquisition [and] Jimmy Young, these are very prominent people within the funeral side of the business, and they're introducing us to a number of their associates." Likewise, during StoneMor's Q2 2013 conference call with analysts, Defendant Yost told investors how the Company planned on "utilizing Jim Young, who is [a] previous owner [of funeral homes] and now an employee of the Company, to help us ramp those and other [funeral home] locations up." During his tenure, Young met with Defendants Miller, Yost, and Hellman on several occasions and at one meeting in March 2015 in Palm Beach, Florida, made a presentation to all of the Company's executives and the Board of Directors.

43.     William "Larry" Russell also joined StoneMor after the acquisition of Young's funeral home properties in February 2013. From early 2013 through September 2016, Russell was a Pre-Need Sales Director and supervised nine employees at six different funeral homes in Florida. Russell worked directly for James Young until Young left StoneMor. Prior to working at StoneMor, in the 1980s, Russell worked as an independent contractor for pre-need sales in North Carolina, Florida and Pennsylvania (the Philadelphia area) for multiple cemeteries and some

funeral homes. Russell became acquainted with Defendant Larry Miller while Miller was employed by Osiris Holding Corporation.

44.     Zsuzsanna Rainey was employed by StoneMor Partners L.P. from November 2009 to September 1, 2016, working at the Company's onsite (at a cemetery) office in Clarksville, Maryland as an Area Director Assistant. According to Ms. Rainey, her responsibilities included collecting forms from each of his/her area's sales managers, including information on each sales counselor's sales volume, number of presentations, number of sales, and number of appointments scheduled for the following day. Ms. Rainey collected this information on a daily basis from the sales managers for approximately 45 – 60 different sales counselors. Ms. Rainey would then email this information, by 10:00 p.m. each night, 365 days a year, to Regional Sales Director, Paula Harris, who in turn sent it to Vice President of Sales, Eastern Division, Jim Lentz. According to Ms. Rainey, Area Director Paul Youse, oversaw StoneMor's largest budgeted area (a $16.5 million annual budget) consisting of nine properties in the Baltimore/Washington D.C./Eastern Shore area. As part of her responsibilities, Rainey assisted Area Director Paul Youse with all daily activities including corresponding with appropriate parties such as, managers, counselors, human resources and regional vice presidents.

45.     CW1 was employed by StoneMor from 2000 to April 2016, except for a 9-month period in 2009. For the majority of the last three years of his/her tenure, CW1 was a Cemetery Manager for StoneMor's Crown Hill Cemetery in Twinsburg, Ohio until he/she left the Company in April 2016. According to CW1, his/her responsibilities as a Cemetery Manager included making budgets for the week, month, and year, as well as motivating and educating her cemetery's sales team. CW1 recalled that "corporate" dictated the budget, and that the Regional Vice Presidents made the budgets for the cemetery sales teams to meet.

46.     CW2 was formerly employed by StoneMor Partners, L.P. at the Company's headquarters in Trevose, Pennsylvania from May 2010 to September 2016. Most recently, from January 2014 through September 2016, CW2 was a Marketing Data Reporting Specialist. Prior to that, CW2 held the positions of Marketing Fulfillment Supervisor from June 2012 through January 2014, Marketing Report Specialist from December 2012 to June 2012 and Marketing Data Entry Clerk from May 2010 through December 2010. In his/her role as Marketing Data Reporting Specialist, CW2 reported to Director of Marketing Operations Carol Hays who in turn reported to Vice President of Marketing Raymond Smith. According to CW2 his/her responsibilities included running weekly sales reports on the Inside Sales Representatives who were located at the Company's Canton, Ohio facility. He/she also updated pricing tables for each location every year into the Company's system, and trained personnel how to use StoneMor's various database systems.

47.     CW3 was employed by StoneMor Partners L.P. as an Administrator from 2003 to 2007, and again from 2010 until December 31, 2016. During his/her most recent tenure, CW3, was an administrator at four different cemeteries in Maryland, including Lorraine Park Cemetery from 2010 through 2012, Glen Haven Memorial Cemetery from 2013 through 2015, Sunset Memorial Park and Hillcrest Burial Park in 2014 (along with Glen Haven), and again at Lorraine Park Cemetery from 2015 until his/her tenure ended December 31, 2016. CW3's responsibilities as an Administrator included payroll, accounting, and processing contracts at each of the sites CW3 worked.

## SUBSTANTIVE ALLEGATIONS

**A.     StoneMor's Business**

48.     StoneMor is the second-largest owner and operator of cemeteries and funeral homes in the U.S. It provides cemetery and funeral products and services, including: (1)

interment rights (*e.g.*, burial plots, lawn crypts, mausoleum crypts, cremation niches, and care of properties in which remains are interred); (2) cemetery merchandise (*e.g.*, burial vaults, caskets, grave markers, and memorials); and (3) cemetery and funeral services (*e.g.*, memorial services, installation of burial vaults, caskets, or other merchandise, as well as opening and closing of the burial plot to install such merchandise or to inter remains).

49.     The Company sells these products and services under two very different circumstances: "pre-need" (prior to death) or "at-need" (at the time of death). Although the overall scope of products offered and sold are the same under either circumstance, whether a particular customer is "at-need" or "pre-need" greatly affects how the Company accounts for and recognizes revenues associated with a sale.

## 1.     StoneMor's MLP Structure Made Distributions the Key to Investors

50.     Although StoneMor describes itself as a "death-care company," and provides cemetery and funeral products and services to its customers, the Company served a different purpose entirely for investors and Defendant StoneMor GP (the Company's General Partner and majority stakeholder). The Company's main corporate purpose throughout the Class Period was to pay holders of the Company's common units large quarterly cash distributions (dividend-like payments) from the Company's so-called "available cash."  Defendants Hellman, Miller, and Shane's exclusive control over the distributions, including the timing of increases in the distribution per unit, allowed Defendants to manipulate StoneMor's cash payments to the Company's partners in order to maximize their own personal gains.

51.     These distributions represented a lucrative source of income that the beneficial owners of the majority and minority interest in StoneMor (through a series of intermediate entities), including Defendants StoneMor GP, GP Holdings, Hellman, Miller, and Shane fully controlled.

     (a)     **StoneMor's Unique Structure Funneled Borrowed Cash to Investors and Defendants StoneMor GP, Miller, and Hellman**

52.    StoneMor's unique business structure as an MLP allows it to operate as a two-tier corporate entity whereby the partnership agreement requires the Company (the limited partnership), to distribute 100% of what is deemed "available cash" to holders of StoneMor common units and the General Partner (StoneMor GP) based on the results of each fiscal quarter.

53.    The proportion of each distribution allocated to StoneMor GP (and ultimately to Defendant Hellman, Miller, and Shane through a series of intermediary entities) depends on certain "incentive distribution rights" meant to provide direct income from each cash distribution to the General Partner and its beneficial owners. Specifically, Defendant StoneMor GP, as the holder of a majority interest in the Company, not only determined the total amount that the Company would distribute on a per unit basis to holders of its common units, but received 23% of each total distribution through nearly the entire Class Period.[6] Indeed, StoneMor GP alone determined how much the cash distribution would be each quarter, and thus the corresponding allocation *it* received as a result.

54.    In fact, it was this steady stream of cash distributions that made StoneMor an attractive investment. Throughout the Class Period, the Company consistently increased the per-unit cash distributions issued each year, which also increased the aggregate amount of distribution the Company paid, as illustrated in the Table 1,[7] below:[8]

---

[6] Pursuant to the partnership agreement, Defendant StoneMor GP's "incentive distribution rights" are dependent on the per-unit cash distributions per quarter. In quarters when the per-unit distribution is $0.5125 or more, StoneMor GP received 13% of all cash distributed; when the per-unit distribution is $0.5875 or more (nearly the entire Class Period), StoneMor GP received 23% of all cash distributed.

[7] The information contained in the tables and charts included herein have been created by Plaintiffs' attorneys and industry experts in accounting based on their analysis of data derived from Capital IQ, a subscription service offered by S&P Global Market Intelligence that compiles

| Fiscal Year | Fiscal Year Distribution Per Unit | Total Distribution Paid |
|---|---|---|
| 2012 | $2.350 | $47,454,000 |
| 2013 | $2.395 | $52,053,000 |
| 2014 | $2.460 | $62,836,000 |
| 2015 | $2.610 | $77,512,000 |
| Q1 to Q3 2016 | $1.650 | $55,806,000 |

  **(b)**  **StoneMor's Numerous Public and Private Offerings of Common Units Significantly Increased the Scale of the Company's Cash Distributions**

  55.  Following the Company's public offering in early 2011, which garnered approximately $80 million in proceeds, StoneMor regularly accessed the capital markets for injections of cash, usually under the justification that the proceeds of unit sales would be used to pay down the working capital line of credit, or otherwise provide an injection of working capital. Not only were these offerings (unbeknownst to investors) the ultimate source of nearly all of the Company's cash distributions, the very offerings themselves compounded the problem by creating significantly higher numbers of unitholders to which the Company would thereafter be obligated to pay cash distributions.

  56.  In fact, over the course of the Class Period, StoneMor received at least seven separate injections of cash through sales of its common units. As set forth in Table 2, below, this amounted to nearly $330 million in equity investments over a period of nearly 4 years:

---

and publishes "real time" and "as of" financial information from publically available sources for companies traded on both public and private securities markets.

 [8] As discussed herein, the Company cut its distribution for the third quarter 2016, halving it as compared to the previous quarter, to $0.33 per unit, and breaking its consistent streak of distributions growth (and causing the unit's price to tumble). On January 30, 2017, StoneMor announced another distribution of $0.33 per unit for Q4 2016. Had the Company continued its $0.66 per unit distribution (the amount it had distributed the three previous quarters) in both Q3 and Q4 2016, StoneMor would have distributed a total of $2.64 per unit in cash to unitholders for the year—and would have maintained its upward trend of distributions growth. Instead, StoneMor distributed only $1.98 per unit in fiscal year 2016.

| Date of Offering | Net Proceeds to the Company (millions) |
|---|---|
| March 21 2013 | $33.8 |
| February 10, 2014 | $46.6 |
| May 21, 2014[9] | $55.0 |
| May 29, 2014 | $58.7 |
| July 7, 2015 | $59.4 |
| November-December 2015 | $7.5 |
| January 1 – March 31, 2016 | $18.8 |
| April 1 – June 20, 2016 | $4.2 |
| April 15, 2016 | $45.2 |
| **Total** | **$329.2** |

57.     In sum, Defendants were reliant on their ability to access fresh cash from capital markets. The effect of these transactions, however, was an unsustainable cycle whereby StoneMor needed to access those markets with greater and greater frequency. Indeed, because with each incremental offering StoneMor was adding 2 million or so more units, that meant there was an ever increasing pool of investors to which StoneMor would then have to pay a distribution. In other words, each distribution was getting more and more expensive. Taken together with Defendants' significant cash flow issues, discussed below, throughout the Class Period, StoneMor financial condition was spiraling out of control.

---

[9] This was a private purchase by AIM of 2,255,947 of common units for $55 million, in association with a commitment to provide StoneMor up to $130 million in funding. The total shares offered during the Class Period, as listed in the table above, does not account for the shares sold to AIM in this private placement.

### 2.  StoneMor Spent to Expand Pre-Need Sales Through Property Acquisitions

58.     Part of Defendants' strategy for growing StoneMor's business was through an aggressive acquisition strategy that they described as "buy and build" — but this strategy significantly facilitated Defendants' ability to obscure the true source of the cash distributions and justify larger and larger distributions throughout the Class Period. As part of this strategy, StoneMor targeted for acquisition cemeteries and funeral homes with significant growth potential. In fact, over the course of the Class Period, StoneMor acquired more than 90 cemeteries and funeral homes.

59.     During the Class Period, StoneMor's largest acquisition resulted in control over the 13 cemeteries owned and operated by the Archdiocese of Philadelphia. The Archdiocese of Philadelphia's properties were ideal for StoneMor's purported "buy and build" philosophy with over 7,000 burials per year and no real pre-need sales program in place. As Miller remarked during the acquisition:

> [T]his is going to be a fabulous deal for the Company. They have never had a meaningful pre-need program. And as I said, they do 7,000 burials throughout the Archdiocese. And we are gearing up our sales force right now. We will probably hire close to 75 salespeople to market the entire five-county area, because the properties fortunately are geographically dispersed throughout the five counties.

60.     However, StoneMor's plans of plundering the Archdiocese's pre-need sales program did not go smoothly for the Company. According to a series of news reports called "Grave Concerns" by The Reporter, a local Philadelphia news outlet, StoneMor's management of the cemeteries resulted in "dozens of complaints about StoneMor's aggressive sales force and other Catholic cemetery issues from members of families they have served for years." According to the article, StoneMor would aggressively pressure customers into buying their pre-

need products and services with claims that the products were sanctioned by the Archdiocese and by obfuscating the actual cost of the products and services, just to close the sale.

61.     Indeed, more beneficial to StoneMor than any acquisition itself (or the smooth implementation of the services and products one would associate with a successful "death-care company") was Defendants' implementation of aggressive pre-need sales programs at newly acquired properties. These pre-need sales required the Company to set a majority of the full value of the pre-need contract in trust until such a time as the Company performed the associated services or delivered the contracted-for products.

62.     By constantly growing their pre-need sales figures, Defendants were able to ***present a misleading picture of consistently growing assets and future cash flows that supposedly justified the Company's cash distributions***. Defendant Shane, StoneMor's Vice Chairman described the strategy at the Company's 2013 Investor Day: "buying and building [means], that we acquire cemeteries that are not fully developed. So we have to put a significant amount of funds into the cemetery to develop the pre-need program, to build the accounts receivable, [and] to build the trust funds. . . ."

63.     Defendant Shane was describing the extensive outlays associated with not just the purchase price of the acquired cemetery or funeral home itself, but with funding the accounts receivables and the trusts underlying most pre-need installment contracts (*see infra*, ¶¶ 70-71), and depositing funds into merchandising trusts, as required by the regulations described below.

64.     Accordingly, in order to pay for its acquisitions and the initial outlays associated with aggressive expansion of pre-need sales at its newly acquired properties, StoneMor began a cycle that caused it to incur increasing amounts of debt over the course of the Class Period. As discussed below, a company can recognize revenue associated with its pre-need sales—and

withdraw associated cash from the merchandise trust—only when the pre-need service and/or product is delivered. Therefore, many of these initial cash outlays that the Company made by acquiring cemeteries could not be recouped in the short-term. The Company's inability to monetize these assets as current revenues while it was taking on increasing levels of debt meant that the Company was underperforming as measured under GAAP.

65.     Market analysts assessing StoneMor's securities occasionally asked about the Company's rapid rate of cash outflows, but the Company always responded by denying any problems, and would consistently reassure investors that the acquisitions were cash positive for the Company. StoneMor highlighted the fact that if StoneMor stopped making acquisitions, the money from the merchandise trusts would start pouring in as the Company delivered on its obligations under the pre-need contracts. Defendant Miller specifically noted on November 12, 2014 at the 2014 Investor Day that:

> [A]s we continue to grow the company [ ] we will be contributing more to the merchandise trust funds and building accounts receivable than we are taking out [of the trusts]. . . . [*B*]*ut if our pre-need sales were no longer growing then the cash flow in a given period would match up exactly with the amount of sales and expenses that we have in a given period.*

66.     The steady stream of acquisitions resulted in the accumulation of a significant new set of assets, in the form of the cemetery real estate (some of which the Company planned on developing) and merchandise trusts for pre-need sales that had been made by the acquired property's previous owner. These fresh assets on the Company's balance sheet put further strain on the Company's cash position. This strain caused the Company to incur significant amounts of borrowings on the credit facility (in addition to the borrowings the Company was incurring to pay out cash distributions to unitholders, as discussed *infra*, ¶¶ 87-97). Unbeknownst to

investors, the Company was regularly scrambling for cash, and ultimately dependent on regular injections of cash from public and private offering of common units, to relieve this strain.

67.    Indeed, Young explained that StoneMor's aggressive "buy and build" philosophy was on full display when StoneMor acquired his funeral home properties in 2013. Young stated that following the Company's acquisition of his Seawinds Funeral Home properties, he immediately saw that StoneMor was focused on booking as much pre-need sales as quickly as possible. Young explained that StoneMor was booking pre-need revenue as if it was at-need so it could recognize the entire sale immediately. According to Young, StoneMor did so because it needed the pre-need sales revenue to make its numbers even though it should not have been recognizing the full sale given the high likelihood that the sale could be cancelled, transferred, or refunded (fully or partially) by the purchaser prior to the need (*i.e.* death) arising.

68.    Young further advised that all of StoneMor's acquisitions during his tenure focused on expanding its pre-need sales at all costs. He recalled that the first questions StoneMor asked any company that it was interested in acquiring regarded the size of its trust and its pre-need department. He further recalled that as soon as the acquisitions closed, Defendants immediately expanded the pre-need sales departments and price aggressively to get the market share of pre-need sales.

**B.      StoneMor Relied Upon Non-GAAP Financial Accounting to Create the Appearance of a Company with Revenues Substantially Higher than Those Actually Earned through Business Operations**

69.    Throughout the Class Period, in order to rationalize (and then pay out) the distributions of "additional cash" that simultaneously lined their own pockets, Defendants focused investor and analyst attention on non-GAAP financial measures. Indeed, these measures (which appeared alongside legally-required GAAP measurements) intentionally gave the impression that StoneMor was generating sufficient operating cash flow to justify the

increasingly burdensome quarterly cash distributions, and obscured the material divergence between the cash distribution payments and the amount and timing of revenue and cash flows generated from operations.

### 1.     StoneMor's Pre-Need Sales Require Particular Accounting Treatment

70.     Pre-need sales allow customers to select and purchase specific products and services from StoneMor before death. Accounting for pre-need sales is more complicated than at-need sales because the customer is contracting to purchase a product and/or service at a time when it is uncertain when that product or service will be used. In fact, StoneMor may not ultimately deliver a product or service relating to a pre-need sale until years or decades after the customer originally signed the contract.[10] This creates a significant lag in timing between the actual sale of a pre-need contract and the time the products and services associated with that pre-need contract are delivered for use upon the customer's death.[11]

71.     Further, state statutory requirements relating to cemeteries and funeral homes require StoneMor (in most of the states it operates) to set aside revenues from pre-need contracts into trusts,[12] which are generally intended to ensure that death care companies have sufficient funds to perform their obligations in the future. As relevant here, according to such regulations, StoneMor must establish various "merchandise trusts" into which it is required to deposit 40%-

---

[10] In many cases, StoneMor may not deliver at all, as the Company experienced a cancelation rate of approximately 8-10% during the Class Period. Such cancelations require a full refund of any funds paid by the customer, even though those may be deposited in the merchandise trust, and credited as assets on the Company's books.

[11] An additional complicating factor is that a vast majority of StoneMor's pre-need sales are not paid in full at the time the contract is signed, but are paid in installments pursuant to the contract.

[12] In contrast, revenue from at-need sales may be recognized at the time that revenue is received, since the products and/or services associated with that sale are delivered at the time of sale, and the Company has no future contractual obligation to deliver additional products and/or services for that sale.

70% of the sales revenue to pay for merchandise it will be obligated to deliver at some point in the future.[13] And pursuant to GAAP, the trusted-revenues associated with these pre-need sales cannot be recognized as current revenue until the service or product associated with the contract has been delivered.

72.     In its financial announcements to investors, however, StoneMor consistently created an illusory picture of the Company's financial health by presenting financial measurements that included these inaccessible merchandise trust assets in the amount it claimed was available to distribute to unitholders and StoneMor GP.

> **2.      StoneMor Included Inaccessible Merchandise Trust Assets in its "Distributable Available Cash Flow"**

73.     Throughout the Class Period, when Defendants announced StoneMor's quarterly financial results, they presented two separate calculations: one measuring the Company's results using only GAAP accounting principles (as required by SEC regulations); and another using non-GAAP accounting principles (which it said presented a more accurate representation of its true financial condition).

74.     Defendants' non-GAAP financial results presented a picture of a Company that was in great financial condition and had significant liquid cash flows that enabled it to provide unitholders with generous distributions. But this picture was made possible only by including in those non-GAAP numbers as a then-current revenue line-item which Defendants called "net operating profit deferral from non-delivered merchandise and services." This line item is a figure that represented the profit the Company claimed it could realize from new contracts but could

---

[13] StoneMor is typically also required to deposit a portion of its sales (for both pre- and at-need contracts) to a "perpetual care trust," to ensure that there are sufficient funds to maintain cemetery grounds well into the future—ultimately in perpetuity. These trusts, however, are ultimately not relevant to the allegations set forth herein.

not yet recognize under GAAP, a portion of which had been received and was held as assets in the merchandise trusts—which, as described above, were inaccessible to the Company because products relating to those funds had not been delivered.

75. By presenting to investors this non-GAAP figure (which the Company claimed was a more reliable metric than regulatory-required GAAP measures), Defendants were able to conceal from the public that StoneMor's ability to pay its quarterly distributions was almost entirely dependent on its easy access to cash proceeds from the sale of its common units in the capital markets.

76. The "net operating profit deferral from non-delivered merchandise and services" line item that the Company included in its non-GAAP financial measures reflected primarily the profits it claimed were attributable to its pre-need contracts. But instead of portraying these assets as ***currently available cash***, which they were not, StoneMor's non-GAAP figures seemed to show that the Company ***could*** realize profits locked away in merchandise trusts during the applicable current quarter, and presented those profits as operating cash flow that was available to distribute to unitholders.

77. This single adjustment made all the difference in the presentation of the Company's financial health. For example, as set forth in Table 3, below, in Q4 2015, Q1 2016, and Q2 2016, StoneMor recorded a net loss pursuant to GAAP, but arrived at significantly inflated "Distributable Cash Flow" simply by virtue of adding back into its current "earnings" statutorily inaccessible funds: the "Net operating profit deferral from non-delivered merchandise and services."[14]

---

[14] The Company made similar adjustments throughout the Class Period that provided the inextricable inference that it had significant cash on hand from current period operations, and that it was this cash that it was distributing to unitholders on a quarterly basis.

| $ Million | | Q4 2015 | | Q1 2016 | | Q2 2016 |
|---|---|---|---|---|---|---|
| **Net loss (GAAP)** | $ | (7.1) | $ | (7.7) | $ | (9.1) |
| Acquisition and related costs | | 1.6 | | 1.7 | | 1.5 |
| Depreciation and amortization | | 3.6 | | 3.1 | | 3.2 |
| Non-cash amortization of cemetery property | | 5.6 | | 2.0 | | 2.4 |
| Non-cash interest expense | | 0.7 | | 0.8 | | 0.8 |
| Non-cash stock compensation expense | | 0.7 | | 0.4 | | 0.4 |
| Maintenance capital expenditure | | (2.9) | | (3.0) | | (1.3) |
| Non-cash income tax benefit (expense) | | 0.4 | | 0.3 | | 0.6 |
| Other gains (losses), net | | - | | 0.9 | | 1.5 |
| Gain on settlement agreement, net | | - | | - | | - |
| Loss on early extinguishment of debt | | - | | - | | - |
| **Net operating profit deferral from non-delivered merchandise and services** | | **16.0** | | **15.4** | | **16.8** |
| **Distributable Cash Flow (non-GAAP)** | $ | **18.5** | $ | **13.9** | $ | **16.8** |

78.    The difference that this non-GAAP metric made can also be seen by comparing the Company's GAAP-based EBITDA and the non-GAAP Adjusted EBITDA[15] which included as current period earnings assets that the Company had no current ability to access, as set forth in Table 4, below:

| For the Fiscal Period Ending | | Q4 2015 | | | Q1 2016 | | | Q2 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Filing Date | | Feb-29-2016 | | | May-09-2016 | | | Aug-05-2016 | | |
| $ Millions | | Adjusted EBITDA (non-GAAP) | EBITDA (using GAAP figs.) | Difference | Adjusted EBITDA (non-GAAP) | EBITDA (using GAAP figs.) | Difference | Adjusted EBITDA (non-GAAP) | EBITDA (using GAAP figs.) | Difference |
| **Total Revenues** | $ | 99.7 $ | 79.2 | $ 20.5 | 95.0 $ | 74.6 | $ 20.5 | 99.7 $ | 75.5 | $ 24.1 |
| Cost Of Revenues | | 39.4 | 38.5 | 0.9 | 38.1 | 33.0 | 5.1 | 40.4 | 35.2 | 5.2 |
| Other Operating Expenses | | | 4.2 | (4.2) | | 5.1 | (5.1) | | 4.7 | (4.7) |
| Selling General & Admin Expenses | | 33.8 | 35.2 | (1.5) | 35.0 | 34.1 | 0.9 | 36.3 | 35.1 | 1.2 |
| **Total Cost of Revenues, Op. Expense & SG&A** | $ | 73.2 $ | 77.9 | $ (4.7) | 73.2 $ | 72.2 | $ 0.9 | 76.7 $ | 75.1 | $ 1.6 |
| **Less:** Depreciation & Amortization, Total | | | 3.6 | (3.6) | | 3.1 | (3.1) | | 3.2 | (3.2) |
| **Plus:** Depreciation & Amortization for EBITDA | | | 3.2 | (3.2) | | 3.1 | (3.1) | | 3.2 | (3.2) |
| **Adjusted EBITDA and EBITDA (as applicable)** | $ | **26.5** $ | **0.9** | $ **25.6** | **21.9** $ | **2.3** | $ **19.6** | **23.0** $ | **0.5** | $ **22.5** |

---

[15] Prior to Q2 2015, the Company disclosed the non-GAAP performance measure Adjusted Operating Profit (rather than the Adjusted EBITDA metric used after that date). Both Adjusted EBITDA and Adjusted Operating Profit reconcile to GAAP through Net Operating Profit Deferral from Non-Delivered Merchandise and Services, which represents the non-GAAP acceleration of profits StoneMor claimed it could achieve. In addition, Adjusted EBITDA is consistently greater than Adjusted Operating Profit, as certain costs (a portion of Costs of Goods Sold, the non-cash portion of Corporate Overhead, Depreciation and Amortization and Acquisition Related Costs, Net of Recoveries) are excluded from its computation.

79.     For example, whereas StoneMor saw only approximately $900,000 in GAAP-based EBITDA in Q4 2015, by including net operating profit deferral from non-delivered merchandise and services accounts in Adjusted EBITDA, the Company gives the appearance that it has actually earned in that period nearly $26.5 million. This and similar adjustments made throughout the Class Period *made the Company appear to have significantly more accessible cash on hand available to distribute to unitholders*, and in the process line their own pockets to the tune of 23% of that distribution.

80.     Reasonable investors did not, and could not, understand that the Company's presentation of its quarterly non-GAAP earnings figures included the *value of future assets* actually held in the merchandise trusts, that could not be realized until the associated product was delivered (pursuant to statutory requirements), and could not be recognized during the Company's current fiscal period pursuant to GAAP. And more fundamentally, they did not understand that these "earnings," which the Company used to justify its cash distributions, were essentially unavailable to StoneMor for *any* purpose until the products and services associated with those future revenues were delivered. Those purported earnings definitely could not be used to fund the cash distributions.

### 3.     Defendants Regularly Told Investors that StoneMor's Quarterly Non-GAAP Accounting was a More Accurate Representation of the Company's Cash Flows

81.     The Company's use of the non-GAAP measures discussed above, created the appearance of a healthy company with significant amounts of liquid cash on hand that was capable of paying a large quarterly distribution well into the future. But since these figures included cash held in the merchandising trusts that could be recognized and accessed only in the future (because of the statutory protections applicable to merchandise trusts, as described above),

they did not accurately portray on a quarterly basis the Company's actual ***cash position***, the key metric to justify the quarterly distributions of "***additional cash***."

82.     Notwithstanding this illusory picture that Defendants had created of the Company's actual available cash on hand from operations, they regularly directed investors to rely primarily on the Company's non-GAAP measures rather than the GAAP metrics, telling them that the non-GAAP figures were more representative of the Company's true position, because StoneMor's business model was unique and poorly understood by the market (including such sophisticated financial analysts as Standard & Poors).

83.     For example, during the 2014 Investor Day, Defendant Yost blamed the SEC's reporting requirements and claimed that it was actually the Company's "GAAP results [that] are a little misleading," and, likewise, Defendant McGrath called on the market to rely instead on inflated non-GAAP measures during the 2015 Analyst/Investor Day:

> I don't know if the SEC can get any more screwed up with regard to revenue recognition rules. This might be a new level in terms of screwed up. So this is why we moved towards the non-GAAP.
>
> *   *   *
>
> [W]e try to show people exactly, "Listen, this is the activity we did during the period. This is what we generated. These are the costs associated with that. ***And that's why you can feel comfortable that we generate enough cash flow to pay a distribution in this period***.

84.     By relying on and presenting to investors these non-GAAP metrics which obscured the Company's true cash position, Defendants were able to hide from the public and reasonable investors that the Company's ability to pay its quarterly distributions was substantially dependent on easy access to cash proceeds from the sale of its common units in the capital markets. Indeed, a significant portion of the total cash distributions paid to unitholders

**and to Defendants StoneMor GP, Miller, Shane, and Hellman**, were ultimately paid from the proceeds of the Company's equity offerings.

85.    Instead of waiting to recognize the revenues and cash flows from funds locked away in trust, as required by state statutes and GAAP, StoneMor immediately recognized merchandise trust revenue and cash flows in its Adjusted EBITDA,[16] Distributable Cash Flow,[17] and Distributable Available Cash[18] before it had actually delivered any of the merchandise or had any practical use of that money.

86.    Ultimately, the Company's presentation of non-GAAP metrics that presented an illusory and inflated portrait of the Company's generation of **currently accessible** cash from its operations that obscured the fact that the ultimate source of cash distribution payments was proceeds of its equity offerings. StoneMor relied on cash raised from repeated equity offerings to fund cash distributions, while it was simultaneously increasing the total number of outstanding common units, diluting the equity interest each unit represented and increasing the incremental cost of each distribution. This unsustainable cycle came to a rapid halt once StoneMor's easy

---

[16]    Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") is a financial measure which seeks to show a company's operating performance. Although not expressly a GAAP-required metric, EBITDA can "be calculated using elements derived [strictly] from GAAP financial presentations." (SEC Regulation G, 2.b.) StoneMor's "Adjusted EBITDA," which specifically adds back in revenues that the Company cannot access during the current period, is a non-GAAP financial measure that includes elements that are clearly non-GAAP.

[17]    "Distributable Cash Flow" is a non-GAAP metric used by StoneMor that Defendants claim is similar to GAAP cash flows from operations, except that it also includes as current revenue "net operating profit deferral from non-delivered merchandise and services," constituted of revenues and costs that the Company holds in trust, as discussed above, but the Company did not have actual access to those funds for purposes of paying costs, operating expenses, or distributions at any point during that current period.

[18]    "Distributable Available Cash" represents the maximum amount of cash which could theoretically be distributed to unitholders in each quarter; but this amount expressly included assets to which StoneMor had no right to access during the current period.

access to the equity markets was substantially impaired by the exact misleading non-GAAP financial metrics discussed above.

## C.     StoneMor Could Not Pay its Cash Distributions from Cash Flows from Operations

87.     As discussed above, Defendants used the Company's quarterly non-GAAP financial metrics to obscure the Company's true then-existing profitability and cash flows from operations. By adding the Company's future anticipated cash flow from pre-need contracts (which the Company described by the non-GAAP line item "net operating profit deferral from non-delivered merchandise and services") back into its GAAP earnings, StoneMor concealed from investors the practical reality that assets from pre-need contracts that were inaccessible to the Company until associated products or services are delivered were not actually available to distribute to unitholders as current cash.

88.     A detailed analysis of the Company's GAAP measures, and how those measures were affected by StoneMor's non-GAAP adjustments, demonstrates the fundamental impact that Defendants' shell game concealed to investors that the Company's ability to pay the level of cash distributions during the Class Period which it did without ready access to the equity markets, a fact Defendants hid from the investing public throughout the Class Period.

### 1.     StoneMor Fueled its Cash Distribution Machine Indirectly by Proceeds from Equity Offerings

89.     As noted above, a significant portion of StoneMor's sales during the Class Period were pre-need sales, and the Company aggressively marketed those pre-need contracts as part of its "buy and build" acquisition strategy. However, the majority of income from these pre-need sales was not accessible to the Company until the products associated therewith were delivered (due to statutorily required merchandise trusts). Therefore, that income derived from pre-need sales could not be recognized as revenue generated during the period in which those pre-need

contracts were sold. Indeed, the Company's practice of releasing financial results with non-GAAP metrics ultimately concealed the fact that it was desperate for cash to fund operations, and ultimately that it funded cash distributions to investors and Defendant StoneMor GP from equity proceeds that had simply passed through its credit facility. This fact is most easily understood by comparing the Company's GAAP and non-GAAP accounting metrics.

90.     For example, the below chart illustrates the Company's GAAP-based "Cash Flows from Operations" by fiscal quarter:



Although not expressly noted in this chart, StoneMor's aggregate GAAP cash-flows from operations over the course of this period (from Q1 2012 through the end of the Class Period) was $109 million.

91.     StoneMor's GAAP cash flows in Q3 2013, after which the Company experienced a significant downward trend in this GAAP measure, indicated that less and less cash was coming into StoneMor that was: (1) accessible to the Company for use in operations (and to fund distributions); (2) capable of current recognition on the Company's financial reports pursuant to

GAAP; and (3) was generated from operations, rather than through financing. In fact, all five quarters in which StoneMor experienced negative GAAP operating cash flows (an indication that there were insufficient funds from ***current operations*** to fund all of the Company's operating costs and expenses during that quarter) came after Q3 2013 in the midst of this downward trend.

92.    Although the Company's GAAP-based cash flow varied over the course of the Class Period, the Company averaged $5.7 million in GAAP cash flow from operations per quarter during that period. But beyond this average, it is apparent, and illustrated above, that StoneMor's ability to access cash flows from its ***current*** operations (what GAAP operating cash flow is intended to measure) was deteriorating markedly over this period.

93.    Yet, in spite of this trend of declining available revenue (pursuant to GAAP), the Company dramatically increased the cash it distributed to unitholders and Defendant StoneMor GP. The chart below compares the declining cash flows from operations noted above against the significant increases in the Company's cash distributions over the course of the Class Period, and makes apparent the Company's inability to fund the distribution simply from the funds it generated on a quarterly basis for operations.



94.     As discussed above, StoneMor used the internally defined non-GAAP line item "net operating profit deferral from non-delivered merchandise and services," to create the appearance that its internally defined "Distributable Available Cash" (which greatly inflated the cash the Company had on hand at the end of each quarter) was almost entirely sufficient to provide the funds for the Company's cash distributions. As illustrated by the graph below, from 2012 through Q3 2016, "net operating profit deferral from non-delivered merchandise and services" accounted for the vast majority of Defendants' non-GAAP metric, "Distributable Cash Flow" (which was the maximum amount of cash on hand the Company claimed available for distribution; the Company typically distributed nearly all of this amount).



Ultimately, the Company's statements that it paid cash distributions from the Company's operating revenue is belied by the fact that those distributions totaled $296 million from 2012 through the end of the Class Period, nearly three times the $109 million in total current period GAAP operating cash flows that the Company generated over that same time.

95.     While StoneMor did have access to other possible sources of capital to pay distributions, such as its revolving credit facility that was supposed to be used primarily to provide working capital, these temporary sources of cash to fund the distributions ultimately came from debt, and needed to be paid back.

96.     The discussion above, and the illustrative charts therein demonstrate one simple conclusion—in direct contradiction to Defendants' consistent public statements to investors, it simply was not possible that the quarterly distributions were funded from the cash from operations to which the Company had actual access. In practice, Defendants' scheme amounted to a shell game, where the distributions were possible only because the Company borrowed the

requisite cash from its working revolving credit facility, which was ultimately repaid by the proceeds from additional sales of equity to new investors.

97.     Finally, the payment of ever-increasing distributions while the Company's cash flow from operations was clearly trending downward only aggravated the Company's cash flow problems, creating a critical situation for StoneMor in 2016 and leading up to the eventual decision to significantly cut the distribution in Q3 2016.

### 2.     Observations of Former StoneMor Executives and Employees Corroborate StoneMor's Precarious Financial Position throughout the Class Period

98.     Allegations from former StoneMor employees also belie the Company's statements that its distributions came from the business' operations, and further demonstrate that not only were operations not the ultimate source of the cash that was being distributed to unitholders, but that the Company was hopelessly cash-strapped, something of which Defendants were well aware at the time.

99.     StoneMor's inability to pay distributions from business operations was also apparent from the drastic cost-cutting measures taken by the Company during the Class Period, confirmed by statements made by former StoneMor employees. According to StoneMor's SEC filings, the Company was required to pay the distribution based on the Company's "operating surplus," *i.e.*, the amount leftover after the Company paid the expenses required to run the business on a day to day basis. However, according to former StoneMor employees, the Company was barely able to generate enough cash flow to pay the Company's day-to-day expenses, much less fund a multi-million dollar distribution each quarter.

100.    During his tenure at StoneMor, James Young recalled that every time there was an upcoming quarterly distribution, StoneMor would make significant cutbacks including cutting back on travel, not incurring expenses related to the cemetery and funeral home operations,

cutting overtime wages, restricting the use of automobiles for Company purposes, and eliminating the necessary maintenance of the funeral homes or cemeteries.

101.    Towards the end of the Class Period, across-the-board cutbacks even began effecting the most basic business requirements. Zsuzsanna Rainey recalled in mid-2015 when the Company contracted for all office supplies (and that everything had to be the least expensive), that a Regional Vice President had to approve anything that needed to be purchased off of the approved list, hired office cleaning went down from two days to one day per week, and overhearing multiple phone calls that employees could not go over 40-hours of work per week.

102.    The Company's cash woes even extended to their use of credit cards. Young recalled that leading up to the distributions, everything at StoneMor would go "past due." According to Young, everything at StoneMor was paid for on credit cards, but when the distribution date was approaching, those credit cards were consistently maxed-out. As a result, Young frequently had to hold off paying bills for his region until after the distribution.

103.    Worst of all, several CWs stated that, during the Class Period, StoneMor ordered many of its employees, including regional Vice Presidents and Area Directors, to take mandatory furloughs in order to conserve cash. For example, Zsuzsanna Rainey specifically recalled one forced furlough in June 2016 that came with little warning. Specifically, Zsuzsanna Rainey recalled that the Company circulated a memo announcing the week long unpaid furloughs for administrative staff and groundskeepers at every location. Similarly, CW2 recalled that a mandatory unpaid weeklong furlough had occurred in June 2016. According to CW2, all non-sales employees were forced to pick a week off that month, and were advised to apply for unemployment.

104.     Likewise, StoneMor attempted to bring in as much cash as possible by engaging in the practice of constructive delivery in order to accelerate cash flow and avoid state trusting regulations, wherever possible. Constructive delivery is the purchasing and delivering of cemetery merchandise and services in advance of the time of customer need (*i.e.*, the time of death), either by installing them in the customer's burial space and by performing certain opening and closing services prior to the time of need. According to StoneMor's SEC filings:

> [W]ithin the allowances of state law, we purchase burial vaults, grave markers, and caskets, and perform initial openings and closings to install the burial vault in the ground before the time of need. When we satisfy the criteria for delivery of pre-need products or perform pre-need services, we are permitted to withdraw the related principal and any income and capital gains that we have not already withdrawn from the merchandise trust, and we recognize the amounts withdrawn, including amounts previously withdrawn, as revenues.

105.     In other words, StoneMor would purchase, deliver, ***and bury*** some of the products related to a pre-need contract and perform the "opening and closing" services ***far in advance of the customer's death***, just so the Company could circumvent the state laws and regulations and gain access to the cash that was otherwise tied up in trust.

106.     According to several former employees and CWs, the practice of constructive delivery was commonplace at StoneMor, especially when the Company was strapped for cash (as was often the case when StoneMor was getting close to making the quarterly cash distribution).

107.     Larry Russell stated that after StoneMor acquired the Archdiocese of Philadelphia's properties, StoneMor immediately began engaging in "constructive delivery" and burying empty vaults in Pennsylvania, just to recognize revenue as soon as possible. According to Russell, StoneMor "would take money out immediately for opening and closing the graves even if the person was still alive." Likewise, CW3 recalled instances where StoneMor pulled

funds allocated to vaults and their installation from the trust a few days before they were actually installed.

108.     In addition to attempting to get as much possible cash in the door each quarter, Defendants also engaged in the practice of inflating their revenue numbers by backdating customer contracts to make it appear as though the quarter was more profitable than it actually was. According to Young, StoneMor had a practice of backdating orders into the previous month; this happened on a monthly basis, and was especially noticeable at the end of each quarter. Young advised that StoneMor waited until well into the new month to close out a previous month, and had the customer or sales person date the contract for the last day of the previous month to make the previous month's numbers look better than they really were. Young added that at the end of the month and quarter, StoneMor would run specials (such as 0% down) and offer higher commissions to its sales personnel to increase its numbers. Young explained that the administrator would then process the sale during the current month but date it for the previous month. Young stated that this practice occurred every quarter.

109.     Zsuzsanna Rainey confirmed StoneMor's practice of backdating contracts. Rainey recalled that, in particular, second quarter of 2016 was a slower quarter than usual, so the Company extended the amount of time it backdated contracts to four additional days in July (as opposed to the normal two to three days). She further added that large discounts to potential customers were given at the end of each month in an attempt to make budget numbers.

110.     Similarly, when asked if backdating was a common practice at StoneMor, CW1 confirmed "yes, it happened all of the time." CW1 recalled that it was done mostly at the end of the month and added that sales generated the first few days of a new year would be backdated to December 31st of the just finished year if the new year started on a weekend.

111.    These cost cutting measures evidence the fact that StoneMor was constantly cash strapped during the Class Period and especially when it was getting close to a distribution. StoneMor did not have sufficient cash flow from operations to support the most basic corporate expenses, much less the quarterly cash distributions that, according to the Company's SEC filings, should have been paid from the Company's cash flow from operations.

**D.     StoneMor's Reliance on the Capital Markets to Fund its Cash Distributions Was Unsustainable**

112.    Given StoneMor's practice of regularly increasing per-unit cash distributions, while simultaneously increasing the overall number of outstanding units (to which it was obligated to pay distributions), at the same time that the Company's actual operating cash flow was steadily declining, it was inevitable that the Company's scheme would eventually collapse.

113.    Eventually, if a company's cash distributions do not reflect its actual earnings and cash flow from operations in the related fiscal period, the company will fail. If earnings and cash flows fall for a period of time, as they did for StoneMor, the company has a choice between lowering distributions to investors, or borrowing to avoid a decrease in distributions. Any borrowings can only be temporary, however, because those borrowings must eventually be repaid from the company's true cash flow from operations. To sustainably grow distributions in the long run, an entity must either increase its revenues, its profitability, or combination thereof. To rely on borrowing to fund distributions, as StoneMor did, would subject a company to ever-increasing debt burden and equity costs thereby hindering the business from growing and succeeding.

114.    StoneMor's practice of accessing the capital markets to pay down borrowings used to fund cash distributions of illusory "Distributable Available Cash" was unsustainable. Over the course of the Class Period, the Company increased its distributions from $11.7 million

in Q1 2012 to $23.3 million in Q2 2016, an average growth rate of nearly 17.7% per year. StoneMor's GAAP revenues, however, grew at a much slower 6.7% per year pace. The graph set forth below demonstrates the divergence between the Company's rapidly increasing cash distributions, and its modest growth in actual GAAP revenue from operations.



115.    Making the Company's long-term prospects even worse, and significantly increasing the risk that StoneMor's cash distribution house of cards would collapse at the slightest financial hiccup, while StoneMor's distributions increased at an average rate of 17.7% annually, its profitability each quarter was steadily declining—falling from $5.7 million in Q1 2012 to a $2.7 million *operating loss* in Q2 2016. The chart below, which illustrates how the Company's cash distributions rapidly increased while the Company's GAAP operating profit generally declined throughout the Class Period:



116.   As set forth in further detail below, this house of cards began to collapse upon the Company's September 2, 2016 announcement that it would be issuing a restatement of its FY 2015 Annual Report, as well as the Financial Reports for Q1 2016 and Q2 2016.

**E.   The Announcement of the Intention to Restate Impairs StoneMor's Access to the Capital Markets**

117.   On September 2, 2016, StoneMor announced that its careless financial accounting and weak control environment caused material errors in its previously issued financial statements for the fiscal years 2013, 2014, and 2015, as well as the first and second quarters of 2016. StoneMor admitted that its internal accounting controls suffered from a material weakness, expressed that investors should no longer rely on more than three years of affected financial results, and acknowledged that it would need to restate its previously issued financial statements.

118.   The restatement process is a laborious and time-intensive exercise and StoneMor did not have current, audited financial statements until the process was completed on November

9, 2016. Unbeknownst to the Class, StoneMor's announcement that it needed to restate would restrict its ability to sell units to fund the cash distributions. This risk remained concealed after StoneMor announced its intention to restate and the truth would not be revealed until the cash distribution was halved, as disclosed on October 27, 2016.

119.    Throughout the Class Period, StoneMor used its shelf registration statements filed with the SEC to register its units for sale and then sell those units in offerings at a later date. Shelf registration statements allowed for unit sales at any time, as long as StoneMor provided a contemporaneous prospectus and met certain necessary conditions *including the provision of current, accurate financial results*. So from September 9, 2016 onward, StoneMor could not sell its units through shelf offerings until *after* it issued amended financial statements correcting the material errors.

120.    The regulations governing shelf offerings, require that "[t]he registrant furnish[] the undertakings required by Item 512(a) of Regulation S-K." 17 C.F.R. § 230.415 (Item 415) Delayed or continuous offering and sale of securities. Item 512(a) of Regulation S-K requires a registrant to "file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement" including "any prospectus required by section 10(a)(3) of the Securities Act of 1933." 17 C.F.R. § 229.512 (Item 512) Undertakings. And "Section 10(a)(3) … provides that whenever the prospectus is used more than nine months after the registration statement's effective date, *the information must be updated so as to be accurate within a time frame of not more than sixteen months prior to use of the prospectus*." 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 2:29 (7th ed. 2016). In sum, because more than nine months had passed since the effective dates for both registration

44

statements,[19] StoneMor needed to provide current, accurate financial statements for the preceding sixteen months before it could sell its units in shelf offerings.

121.    Typically, a healthy, well-run registrant relies on its previously issued financial statements and incorporates them into the prospectus used in the current offerings, which suffices to satisfy SEC Items 415 and 512(a) (as described in ¶120). StoneMor, however, could not take advance of this expedited process because it had admitted its previously issued financial statements contained material errors and expressly informed investors to no longer rely on them.

122.    Additionally, the At-the-Market shelf registration included a specific representation concerning the issuance of financial statements which prevented its use during the pendency of the restatement.[20]

123.    StoneMor's admission that there were material errors in the previously issued financial statements prevented it from representing that the historical financial statements "present fairly in all material respects the financial condition, results of operations and cash flows of the Partnership" and that the "financial statements have been prepared in conformity with generally accepted accounting principles."

---

[19] During the Class Period, StoneMor sold units pursuant to a registration statement effective on December 16, 2013 allowing for the sale of up to $500 million in units and an At-the-Market registration statement (also effective December 16, 2013), allowing for the sale of up to $100 million in units.

[20] The shelf registration agreement required that "[t]he StoneMor Parties . . . represent and warrant to the Agents . . . as of each Applicable Time," which is defined as "the time of each sale of any Placement Units pursuant to this Agreement, " that "[t]he historical financial statements included in the Registration Statement and the Prospectus . . . present fairly in all material respects the financial condition, results of operations and cash flows of the Partnership . . . [and] said financial statements have been prepared in conformity with generally accepted accounting principles ("GAAP")."   Additionally, StoneMor needed to represent that "[t]he summary financial information included in the Prospectus is accurately presented in all material respects. . . ."

124.    Therefore, there were two reasons the announcement of the restatement impaired StoneMor's ability to sell units to generate cash for distributions: (1) SEC regulations required the Company to provide accurate financial statements with the current prospectus before it could utilize a shelf registration to make an offering of units and (2) the At-the-Market agreement required a representation StoneMor could not give concerning the accuracy of its financial statements.[21]

125.    The Defendants' distribution engine had overheated. As a result, for two months, the Defendants could not rely on the sale of equity to cover the difference between true cash flow from operations and the amount to be paid out in the quarterly distribution. Defendants made a corporate decision that they had to stop driving the distribution engine into the ground, lest they destroy it entirely.

126.    So on October 27, 2016, prior to StoneMor's completion of the restatement process and prior to StoneMor having accurate financial statements, the Defendants halved the distribution causing a precipitous drop of almost 45% in unit prices.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

A.    **2011 Form 10-K, Earnings Call, and Press Release**

127.    The Class Period begins on March 15, 2012, when the Company filed its Annual Report on Form 10-K for fiscal year 2011 with the SEC, which was signed by Defendants Miller and Shane. On that date, Defendants also issued a press release and conducted an earnings conference call.

---

[21] Ultimately, StoneMor would need to restate again, announcing on February 27, 2017 that it would be delaying the filing of its Annual Report for fiscal year 2016. On March 16, 2017, the Company announced that the filing would be even further delayed.

128.    StoneMor's press release noted that the Company's distribution of $0.585 per unit in January 2012 was justified by "*a substantial buildup in our liquid net asset position* as compared to prior periods," that was caused by "recent operating results, the impact of [its] capital restructuring, and the impact . . . [of] recent acquisitions."

129.    The same day on StoneMor's earnings conference call, the then-CFO Defendant Shane responded unequivocally that "*we intend to always continue to fund distributions from the business*" after being directly pressed by a financial analyst on the source of its cash distributions and whether the Company would sell equity in order to fund those distributions.

130.    The statements set forth in ¶ 128 were materially false and misleading. StoneMor's "liquid net asset position" included the full value of the merchandise trusts as liquid assets. However, these assets were statutorily required to be left in a trust until the Company delivered merchandise products for each contract, as discussed *supra* at ¶¶ 70-71, 74-75, 80. As such, there was no "substantial buildup in [StoneMor's] liquid net asset position" which could justify the cash distributions. Regardless, StoneMor created the false impression that these merchandise trust funds were accessible and capable of being used to fund the near-term distributions. Additionally, the Company omitted to state that the business's "recent operating results, the impact of [its] capital restructuring, and recent acquisitions" could not fully fund the distribution payments it was making. Defendants also omitted the material information that StoneMor was relying on equity sales to fund normal quarterly cash distributions to unitholders.

131.    Further, Defendant Shane's statement that "we intend to always continue to fund distributions from the business," as set forth in ¶ 129 above, was materially false and misleading when made. As discussed above (*see* ¶¶ 87-97), Defendant Shane did not, could not, and never intended to fund the distributions "from the business," *i.e.*, from day-to-day business operations,

and the revenues and profits those operations generated. Instead, as discussed above (*see* ¶¶ 55-57, 87-97), StoneMor funded the distributions from equity sales. Indeed, Defendant Shane had no reasonable basis to believe (and therefore, did not believe) that StoneMor would fund distributions from the business's operating profits.

**B.      Q1 2012 Form 10-Q, Earnings Call, and Press Release**

132.    On May 9, 2012, StoneMor filed its Quarterly Report for the three months ending March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Miller and Yost.

133.    In the press release accompanying the May 9, 2012 Quarterly Report the Company reiterated its justification for the $0.585 per unit distribution payment in January of 2012:

> We made this decision after evaluating recent operating results, the impact of our capital restructuring, and the effect on our financial position of recent acquisitions. ***These occurrences led to a substantial buildup in our liquid net asset position as compared to prior periods, which we believe supports our decision to maintain our distribution.***

134.    StoneMor also claimed in the press release that the "***primary source of cash from which to pay partner distributions and make routine capital expenditures is operating cash flow***. Over longer periods of time, operating cash flows should exceed the sum of routine capital expenditures and partner distributions."

135.    StoneMor's statement, as set forth in ¶ 133, that it believed its liquid net asset position "supports our decision to maintain our distribution" could not have been reasonably believed at the time it was made. StoneMor included the merchandise trust assets as liquid net assets despite the fact that the assets were statutorily required to be left in a trust until the Company delivered merchandise products for each contract, as discussed *supra* at ¶¶ 70-71, 74-75, 80. And the business could not generate enough cash to fund its increasing distributions

alone, *see* ¶¶ 87-97. Therefore, StoneMor had no reasonable basis to believe (and therefore, did not believe) that it would fund distributions from the business's cash.

136.    The Company's statement that the "primary source of cash" for distributions "is operating cash flow," as set forth in ¶ 134, was materially false and misleading. As discussed above (*see* ¶¶ 87-97), the "primary source of cash" for distributions could not have been "operating cash flow" because the Company's cash distributions exceeded its cash from operations. While StoneMor touted its ability to accelerate its operating cash flow by extracting money from the merchandise trust in advance of customer need, the Company did not accelerate its operating cash flow enough to fund its cash distributions (*see* ¶¶ 87-97). Additionally, StoneMor omitted to state that its cash distributions were contingent upon its access to the capital markets and that it used the proceeds from equity offerings to pay the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**C.    September 2012 Distribution Increases**

137.    On September 17, 2012, the Company issued a press release entitled "StoneMor Partners L.P. Issues Distribution Guidance."  The Company stated that "***we determine the distribution based on the operating performance of the company and the resultant Available Cash at the end of the quarter***," and that "***[g]iven the solid performance this year so far and what [it] expected w[ould] be continued good performance,*** [it was] comfortable [] affirming [its] distribution of at least $0.585 per unit through the end of the year."

138.    About a month after announcing that StoneMor would issue a distribution of at least $0.585 for the remainder of 2012, StoneMor increased its cash distribution. On October 22, 2012, the Company issued a press release entitled "StoneMor Partners L.P. Announces Distribution Increase and Date for Third Quarter 2012 Financial Results." In the press release,

Defendant Miller claimed that the increase in the distribution "*is a testament to the strength of our underlying business*, and the execution of our growth strategy."

139.    The statements made by StoneMor and Defendant Miller suggesting that the distribution was based on "the operating performance of the company," its "solid performance," or "the strength of our underlying business," as set forth in ¶¶ 137-138 were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, could not, and never intended to fund the distributions from the performance of the business, *i.e.*, from day-to-day business operations, and the revenues and profits those operations generated. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**D.    Q3 2012 Form 10-Q, Earnings Call, and Press Release**

140.    On November 6, 2012, StoneMor filed its Quarterly Report for the three months ending September 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Miller and Yost. Defendants also issued a press release and conducted an earnings conference call.

141.    Defendant Miller also emphasized in the November 6, 2012 press release that the Company's decision to increase its distribution from $0.585 to $0.59 per unit "reflects the *strength of our business* and our commitment to generate increasing returns for our unit holders."

142.    The statement referenced in ¶ 141 was false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, could not, and never intended to fund the distributions as a result of "the strength of the business," *i.e.*, from day-to-day business

operations, and the revenues and profits those operations generated. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent upon its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

### E.    Spring 2013 Offering and Increased Distribution

143.    In a March 21, 2013 press release, StoneMor informed the market that it was selling 1,400,000 units at a price of $25.35 per unit and expected to receive $33.3 to $38.4 million in net proceeds. The press release stated that "***StoneMor intends to use the net proceeds from the common units it is offering to pay down the borrowings outstanding under its existing credit facility.***"

144.    The statements referenced in ¶ 143 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions

created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

145.    On April 24, 2013, StoneMor issued a press release entitled "StoneMor Partners L.P. Announces Increased Distribution and Date for Conference Call to Discuss 2013 First Quarter Financial Results."   In that press release, Defendant Miller noted that StoneMor was "very happy to announce our second distribution increase in six months," and that "*[a]ll of [StoneMor's] growth strategies, i.e. cemetery acquisitions, funeral home acquisitions etc., have been on display of late and this distribution increase is a reflection on our ability to successfully implement these strategies*."

146.    The statements referenced in ¶ 145, that StoneMor's "growth strategies" and the distribution increase was a reflection of that, were false and misleading when made. As discussed above (*see* ¶¶ 87-97, the Company did not, could not, and never intended to fund the distributions from its business operations or growth strategies. As discussed above (*see* ¶¶ 87-97), StoneMor funded the distributions from equity sales. Defendant Miller did not and could not have had a reasonable basis to believe that StoneMor was funding its distributions due to the success of its growth strategies alone. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

## F.    Q1 2013 Form 10-Q, Earnings Call, and Press Release

147.    On May 7, 2013, StoneMor filed its Quarterly Report for the three months ending March 31, 2013 on Form 10-Q with the SEC, which was signed by Defendants Miller and Yost.

148. In the Quarterly Report, StoneMor claimed that "[o]n March 26, 2013, we completed our most recent follow-on public offering of 1,610,000 common units at a price of $25.35 per unit. Net proceeds of the offering … were approximately $38.4 million. ***The proceeds were used to pay off debt on our Credit Facility***."

149. The statements referenced in ¶ 148 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

## G.    May 2013 Increased Distribution

150. On May 29, 2013 StoneMor issued a press release entitled "StoneMor Partners L.P.'s Capital Management Actions Reduce Interest Expense; Company Increases Distribution." In that press release, Defendant Miller stated that: "As a growing company, we strive to manage our capital with the goal of keeping our financial profile as conservative as possible. . . In addition to managing our financial profile, we are also committed to creating value for our unit

holders. ***The savings created by these actions*** [exchanging the 2017 Notes for the 2021 Notes], ***along with continued financial performance allow us to increase our distribution by a half a cent per quarter***, the third such increase in the past eight months."

151.   The statements referenced in ¶ 150 were false and misleading when made. As discussed above (*see* ¶¶ 87-97, the Company did not and could not fund the distributions from the "continued financial performance" of the business, even including the cost savings created by extending the maturity of its debt. Instead, as discussed above (*see* ¶¶ 89-97), StoneMor funded the distributions from equity sales. Defendant Miller did not and could not have had a reasonable basis to believe that StoneMor would fund distributions from the business's cost savings from extending the debt's maturity or the financial performance of the Company. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**H.    Q2 2013 Form 10-Q, Earnings Call, and Press Release**

152.   On August 7, 2013, StoneMor filed its Quarterly Report for the three months ending June 30, 2013 on Form 10-Q with the SEC, which was signed by Defendants Miller and Yost.

153.   In the August 7, 2013 press release Defendant Miller noted:

> [t]he previously announced refinancing of our Senior Notes has extended the maturity date to 2021 and will generate significant interest cost savings. . . . In fact, ***the anticipated savings were strong enough that we increased our quarterly distribution to $0.60 per unit just after the refinancing***, the second such increase in the quarter and the third increase in the last eight months. Our capital management efforts, combined with solid operating

performance, keep us on track for what we believe will be continued strong financial results throughout the year.

154.     The statements referenced in ¶ 153 were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company was not able to increase its distribution simply because of the cost savings created by extending the maturity of its debt. Instead, as discussed above (*see* ¶¶ 89-97), StoneMor funded the distributions from equity sales. Defendant Miller did not and could not have had a reasonable basis to believe that StoneMor would fund distributions from the business's cost savings from extending the debt's maturity or the financial performance of the Company. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**I.     November 2013 Investor Day**

155.     On November 18, 2013 during the StoneMor Investor Day, Defendant Yost noted that StoneMor was often asked how it managed to pay distributions well in excess of its (relatively small) operating profit. Defendant Yost referred to a graph and claimed:

> So if you look the orange is our GAAP operating profit and the grey bars are the amount that we distributed during each period. The green bars are how much we have actually earned, how much current revenue, current expenses, all those things. And ***we always have a significant amount of coverage over the amount that we distributed during the quarter***. I mean this is a very powerful slide when we talk to a lot of people. They then start to understand that ***our distribution is earned currently and this is how we pay it***.



(Source: StoneMor Partners L.P. November 18, 2013 Analyst/Investor Day Presentation)

156.   Defendant Yost went on to state:

> In order to carry out our acquisition philosophy, what we do is we borrow money on a short-term on our revolver and then use equity offerings to de-lever and to free up our balance sheet to go out and do more acquisitions. That's our growth strategy and has been since we started. So that end this year, *we raised an additional $40 million in equity to pay down some existing debt for previous acquisitions* and we have worked forward from there.

157.   The statements referenced in ¶ 155, that StoneMor had a "significant amount of coverage over the amount we distributed," were false and misleading when made. StoneMor's purported coverage was based on Adjusted Operating Profits which included the full value of the

merchandise trusts as liquid assets. However, these assets were statutorily required to be left in a trust until the Company delivered merchandise products for each contract, as discussed *supra* at ¶¶ 70-71, 74-75, 80. As such, there was no "significant amount of coverage over the amount [StoneMor] distributed." Regardless, StoneMor created the false impression that these merchandise trust funds were accessible and capable of being used to fund the near-term distributions. Defendants also omitted the material information that StoneMor was relying on equity sales to fund normal quarterly cash distributions to unitholders.

158.    The statements referenced in ¶ 156 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**J.    February 2014 Public Offering**

159.    On February 11, 2014, StoneMor issued a press release entitled "StoneMor Partners L.P. Prices Upsized Public Offering of Common Units." In the press release, the

Company noted that it expected to receive $46.1 million to $53.1 million in net proceeds from the unit offering. The Company claimed that it "intends to use **the net proceeds from the common units it is offering to pay down borrowings outstanding under its existing credit facility**" and that the "[*a*]**mounts to be paid down under StoneMor's credit facility were incurred for acquisitions and General Partnership purposes, including for working capital needs and to fund StoneMor's capital expenditure program**."

160.    The statements referenced in ¶ 159 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

161.    The statements referenced in ¶ 159 were also false and misleading when made because StoneMor claimed that the borrowings on the revolving credit facility were used for acquisitions and general corporate purposes (including working capital needs and its capital

expenditure program). However, StoneMor omitted the material information that it was borrowing on its credit facility to fund its cash distribution (as alleged in ¶¶ 89-97, above). A reasonable investor would not and did not believe that working capital needs or capital expenditures, included payments to unitholders. Defendants knew that the borrowings drawn from credit facility had, at least in part, been used to fund the cash distributions to common unitholders, to StoneMor GP, and in turn to Defendants Miller and Hellman.

**K.      2013 Form 10-K, Earnings Call, and Press Release**

162.    In the Annual Report for fiscal year 2013 filed with the SEC on March 17, 2014, the Company stated that "[o]n February 27, 2014, we completed a follow-on public offering of 2,300,000 common units at a price of $24.45 per unit. Net proceeds of the offering, after deducting underwriting discounts and offering expenses, were approximately $53.1 million. ***The proceeds were used to pay down borrowings outstanding under our revolving credit facility***."

163.    The March 14, 2014 press release accompanying the Annual Report, reiterated that the proceeds of the unit offering would be used to pay down borrowings. Defendant Miller stated, "[w]e are very excited by the strategic actions we've taken in 2013 as well as so far in 2014, when a recent unit offering raised approximately $53.1 million, ***primarily for the purpose of paying down borrowings***."

164.    The statements referenced in ¶¶ 162-163 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that

facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**L.    May 2014 Public Offering**

165.    On May 29, 2014, StoneMor issued a press release entitled "StoneMor Partners L.P. Prices Public Offering of Common Units." The Company noted that "it has priced 2,600,000 common units representing limited partner interests in StoneMor at a price to the public of $23.67 per unit" and expects $58.2 to $67.0 million in net proceeds. Defendants further stated that "StoneMor intends to use the net proceeds from the offering first to pay the purchase price of certain assets to be acquired from Service Corporation International ("SCI") and to *use the remainder of the net proceeds to pay down borrowings outstanding under its existing credit facility*."

166.    The statements referenced in ¶ 165 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to

correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**M.     June 2014 Increased Distribution**

167.    On July 25, 2014, StoneMor issued a press release entitled "StoneMor Partners L.P. Announces Increased Distribution and Date for Conference Call to Discuss 2014 Second Quarter Financial Results." In the press release, Defendant Miller claimed: "***With the strong performance of our base operations and the results we're beginning to see from these two transactions, we believe we should be able to increase distributions by at least $.01 per unit each quarter through 2015***."

168.    The statements referenced in ¶ 167 were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, could not, and never intended to fund the distributions from the "strong performance of our base operations," *i.e.*, from day-to-day business operations, and the revenues and profits those operations generated. Defendant Miller had no reasonable basis to believe (and therefore, did not believe) that StoneMor would fund distributions from the business's base operations. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), Defendant Miller omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**N.      Q2 2014 Form 10-Q, Earnings Call, and Press Release**

169.    On August 8, 2014, StoneMor filed its Quarterly Report for the three months ending June 30, 2014 on Form 10-Q with the SEC, which was signed by Defendants Miller and Yost. Defendants also issued a press release and conducted an earnings conference call.

170.    In the Quarterly Report for the three months ending June 30, 2014, StoneMor claimed:

> On June 12, 2014, after the exercise of the underwriters' over-allotment option, the Company completed a follow-on public offering of 2,990,000 common units at a price of $23.67 per unit. Net proceeds of the offering, after deducting underwriting discounts and offering expenses, were approximately $67.3 million. The proceeds from the offering were used to pay the purchase price related to the transaction with Service Corporation International, which closed in the second quarter of 2014, ***with the remainder used to pay down borrowings outstanding under the Credit Facility***.

171.    The statements referenced in ¶ 170 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions

created a concealed risk that distributions would be cut significantly if the Company's access to

the capital markets was ever impaired.

**O.     November 2014 Investor Day**

172.    On November 12, 2014, StoneMor held its annual StoneMor Partners L.P.

Investor Day. During the conference, Defendant Yost stated:

> One of the questions that comes up a lot is based on your GAAP
> revenues, how could you possibly make the distributions that you
> make. As I showed earlier, a comparison to GAAP revenues is --
> and GAAP operating profits doesn't make much sense and that that
> is not our current production, that is not our current business. So
> when you look at the three combined together and you look at our
> operating profits, you look at the amount of distributions and you
> look at our GAAP operating profits, you see the big divergence in
> the three. ***We are clearly in [every] period earning well in excess
> of the distribution that we make***. In fact, our average distribution
> coverage has been about 1.23 times for the history of the company.
> So it's very safe, it's very stable, very secure if you look at it on [a
> production based revenues perspective.] … [B]ecause our
> accounting is a little strange, because we are an MLP, [this] is a
> death care company, because we are a cemetery-focused death care
> company rather than a funeral death care company, our stock is
> misunderstood to some extent.

173.    The statements referenced in ¶ 172 were false and misleading when made. As

discussed above (*see* ¶¶87-97), the Company omitted to state that, to the extent its "earnings"

may have been in excess of the distribution, the majority of those "earnings" were locked in

merchandise trusts and inaccessible. Further, as discussed above (*see* ¶¶ 55-57, 89-97),

StoneMor omitted to state that its ability to fund cash distributions was contingent on its access

to the capital markets and that it used the proceeds of equity offerings to pay the distribution.

StoneMor's use of equity sales to fund distributions created a concealed risk that distributions

would be cut significantly if the Company's access to the capital markets was impaired.

**P.      Q1 2015 Form 10-Q, Earnings Call, and Press Release**

174.    In the May 8, 2015 press release, Defendant Miller claimed "*[t]he pace of our business and our expectations going forward also gave us the confidence, as previously announced, to raise our distribution* for the first quarter to $0.64 per unit from $0.63, our fourth consecutive quarterly increase. In addition, *we remain confident in our intention to continue to increase distributions* by $0.01 per quarter through the end of 2015."

175.    The statements referenced in ¶ 174 were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, could not, and never intended to fund the distributions from "the pace of our business," *i.e.*, from day-to-day business operations, and the revenues and profits those operations generated. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor funded the distributions from equity sales. Defendant Miller had no reasonable basis to believe (and therefore, did not believe) that it would fund future distributions from the "the pace of [the] business and [its] expectations going forward." Instead, StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**Q.      July 2015 Public Offering**

176.    On July 7, 2015, StoneMor issued a press release entitled "StoneMor Partners L.P. Prices Public Offering of Common Units." StoneMor announced that it had priced 2,100,000 common units at a price of $29.63 per unit. StoneMor expected $58.9 million to $67.8 million in net proceeds. The Company stated that "*StoneMor intends to use the net proceeds from the offering to pay down outstanding indebtedness under its revolving credit facility*."

177. The statements referenced in ¶ 176 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**R.     Q2 2015 Form 10-Q, Earnings Call, and Press Release**

178. On August 10, 2015, StoneMor filed its Quarterly Report for the three months ending June 30, 2015 on Form 10-Q with the SEC, which was signed by Defendant Miller and StoneMor's interim CFO James Pippis. In the August 10, 2015 press release that accompanied the quarterly report, Defendant Miller stated that "*[t]he continued strength in our revenue growth and distributable free cash flow allowed us to increase our distribution* for the second quarter by $0.01 per unit to $0.65 per unit as previously announced."

179. In the Quarterly Report for the three months ending June 30, 2015, StoneMor claimed: "On July 10, 2015, we completed a follow-on public offering of 2,415,000 common units at a public offering price of $29.63 per unit. Net proceeds of the offering, after deducting

underwriting discounts and offering expenses, were approximately $67.8 million. ***The proceeds were used to pay down outstanding indebtedness under our Credit Facility***."

180.    The statements referenced in ¶ 178 were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, could not, and never intended to fund the distributions from the performance of the business, *i.e.*, from day-to-day business operations, and the revenues and profits those operations generated. Defendant Miller had no reasonable basis to believe (and therefore, did not believe) that it would fund distributions from the "continued strength in [StoneMor's] revenue growth." Instead, as discussed above (*see* ¶¶ 55-57, 89-97), Defendant Miller omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

181.    The statements referenced in ¶ 179 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as

alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**S.     November 2015 Investor Day**

182.    The Company held an Investor and Analyst Day on November 11, 2015 to describe to unit holders the state of the business. Defendant McGrath explained:

> I don't know if the SEC can get anymore screwed up with regard to revenue recognition rules. This might be a new level in terms of screwed up. So this is why we moved towards the non-GAAP.... But we look at how we characterize our cash flow on our press release and the non-GAAP measure of it. We remove all of the arcane and bizarre deferral rules. And we try to show people exactly, 'Listen, this is the activity we did during the period. This is what we generated. These are the costs associated with that.' And that's why you can feel comfortable that ***we generate enough cash flow to pay a distribution in this period***.

183.    The statement in ¶ 182 that "we generate enough cash flow to pay a distribution in this period" was false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company did not, and could not have "generate[d] enough cash flow" from the performance of the business, (i.e., from day-to-day business operations, and the revenues and profits those operations generated) to pay the "distribution in this period."  Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor omitted to state that its ability to fund cash distributions was contingent on its access to the capital markets and that it used the proceeds of equity offerings to pay the distribution. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

**T.        November Announcement of Equity Agreement**

184.    On November 19, 2015, StoneMor issued filed a form 8-K with the SEC announcing "entered into an At-the-Market Issuance Sales Agreement" (the "ATM Equity Program") with a group of banks "whereby it may sell from time to time . . . common units representing limited partner interests having an aggregate offering price of up to $100,000,000." According to the press release, "[t]he Partnership *intends to use the net proceeds from any sales pursuant to the ATM Agreement . . . to pay down outstanding indebtedness under its revolving credit facility*."

185.    The statements referenced in ¶ 184 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

U.   **April 2016 Public Offering**

186.   On April 15, 2016, StoneMor issued a press release announcing that it had priced 2,000,000 common units at $23.65 per-unit for sale to the public. StoneMor expected to receive $44.7 to $51.5 million in net proceeds. The Company commented that it "***intends to use the net proceeds from the offering to pay down outstanding indebtedness under its revolving credit facility***."

187.   The statements referenced in ¶ 186 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

V.   **Q1 2016 Form 10-Q, Earnings Call, and Press Release**

188.   On May 9, 2016, StoneMor filed its Quarterly Report for the three months ending March 31, 2016 on Form 10-Q with the SEC, which was signed by Defendants Miller and McGrath. Defendants also issued a press release and conducted an earnings conference call.

189.    In the Quarterly Report for the three months ending March 31, 2016, StoneMor claimed:

> On April 20, 2016, the Partnership completed a follow-on public offering of 2,000,000 common units at a public offering price of $23.65 per unit . . . . Additionally, the underwriters exercised their option to purchase an additional 300,000 common units, resulting in net proceeds of $6.8 million, after deducting underwriting discounts and offering expenses, of $51.5 million. The ***proceeds from the offering were used to pay down outstanding indebtedness under the Credit Facility***.

190.    The statements referenced in ¶ 189 were false and misleading when made. As discussed above, Defendants' statement about the intended use of equity sale proceeds was misleading because those proceeds were ultimately used to fund the cash distributions, and the Company was unable to do so from cash flow from current operations (*see* ¶¶ 87-97). Although the distributions were primarily funded from the Company's credit facility, those borrowings could not have been repaid absent the proceeds from equity sales; the Company could not pay future distributions by borrowing on the credit facility unless the balance outstanding on that facility had been reduced using proceeds from equity sales. Further, StoneMor had a duty to correct its previous false and misleading statements that its cash distributions would continue to be funded "from the business" (as alleged in ¶ 129, above) or from "operating cash flow" (as alleged in ¶ 134, above), and should have disclosed at this time the material fact that it was using the equity sales to fund the distributions. StoneMor's use of equity sales to fund distributions created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired.

**W.    June 2016 Investor Conferences**

191.    On June 2, 2016, StoneMor attended the 2016 Master Limited Partnership Association Investor Conference. During the conference, Defendant McGrath stated: "***People say***

*you raise equity to pay your distributions and that couldn't be further from the truth*. We look at the amount of equity we raised over the last three years compared to what we used that equity for which are acquisitions, contributions to our trust funds, and expansion capital expenditures. We'll see here that *every dollar went to fund those properties*."

192.     On June 28, 2016, StoneMor attended the Three Part Advisors' East Coast IDEAS Conference at which Defendant McGrath claimed: "*We got some comments*, particularly from some short sellers that are out there, *that we raise equity in order to pay a distribution. And it couldn't be further from the truth.* When you look at the last three years, the top orange line is the amount of equity we've raised over that period. We use equity to fund acquisitions, contributions to our trust funds, and expansion capital expenditures. When you look at the last three years, when you total these three amounts, the total amount raised versus the total amount used almost matches dollar for dollar. *So when we raise equity, it is to grow the business or to put money in the trust*, that we know we're going to take back out at some point in time."

## Working Capital Items



- Principal working capital needs
  - Fund contributions to Merchandise and Perpetual Care trusts
  - Expansion capital expenditures

| ($ in millions) | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Net cash received from issuance of limited partners units | $75,156 | $173,497 | $38,377 |
| Net cash paid for acquisitions and management agreements | $18,800 | $109,381 | $14,100 |
| Net contributions to Merchandise and Perpetual Care trusts | 52,332 | 28,828 | 36,919 |
| Expansion capital expenditures | 7,402 | 6,176 | 5,766 |
| Subtotal | $78,534 | $144,385 | $56,785 |

- GAAP operating cash flow impacted by working capital movements associated with flows to Merchandise and Perpetual Care trust

24

(Source: StoneMor Partners L.P. June 2016 Boston IDEAS Investor Conference presentation)

193.    The statements referenced in ¶¶ 191-192, that it "couldn't be further from the truth" that the Company raised equity to pay its distributions, were false and misleading when made. As discussed above (*see* ¶¶ 87-97), the Company could not have funded the distributions without the proceeds from the equity sales. Instead, as discussed above (*see* ¶¶ 55-57, 89-97), StoneMor did fund the distributions from equity sales. In reality, while the proceeds from the equity sales may have been used to pay down borrowings in form, in substance StoneMor relied on the proceeds of the equity sales to maintain the high level of cash distributions. Therefore StoneMor omitted material information that it used proceeds from equity offerings to pay the

distribution. StoneMor's use of equity sales to fund distributions also created a concealed risk that distributions would be cut significantly if the Company's access to the capital markets was impaired.

## X.    Announcement of the Intention to Restate

194.    On September 2, 2016, StoneMor announced that "the Partnership intends to restate its consolidated financial statements for the fiscal years ended December 31, 2013 through 2015 and the fiscal quarters ended March 31, 2016 and June 30, 2016."  In that press release, the Company claimed that: "[t]he restatement is not expected to have any impact to net income (loss), total assets, total liabilities, total partner's capital, Adjusted EBITDA, Distributable Cash Flow, or cash distributions for the aforementioned periods."

195.    The statements set forth in ¶ 194 were false and misleading when made. StoneMor's announcement of its intention to restate continued to conceal the material risk that distributions would be cut significantly if the Company's access to the capital markets was ever impaired. The need to restate put StoneMor's scheme at risk; if it could no longer access the capital markets, it would be impossible for StoneMor to continue the high level of cash distributions. Unbeknownst to the Class, StoneMor's announcement that it needed to restate would restrict its ability to sell units to fund the cash distributions. This risk remained concealed after StoneMor announced its intention to restate and the truth would not be revealed until the cash distribution was halved, as disclosed on October 27, 2016.

## Y.    False and Misleading Certifications

196.    In addition to disseminating false statements in SEC filings, press releases, earnings calls, and conferences, the Defendants expressly assured investors in the fiscal year 2015 Annual Report issued on February 29, 2016 and the Quarterly Reports issued on May 9, 2016 and August 5, 2016 that Defendant Miller and Defendant McGrath, as the Company's CEO

and CFO respectively, had "carried out an evaluation . . . of the effectiveness of our disclosure controls and procedures" and "[b]ased upon . . . [that] evaluation, our Chief Executive Officer and our Chief Financial Officer *concluded that our disclosure controls and procedures were effective*. . . ."[22]

197.    Separately, for the Quarterly Reports and Annual Reports filed with the SEC from March 15, 2012 through the end of the Class Period, Defendant Miller and CFO Defendants[23] Shane, Yost, and McGrath personally signed certifications pursuant to Exchange Act Rule 13a-14(a), which falsely attested that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of StoneMor Partners L.P.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures

---

[22] Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures. SEC Rule 13a-15, 17 C.F.R. §240.13a-15; SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

[23] Defendant Miller signed every Quarterly and Annual Report issued by StoneMor during the Class Period. Defendant Shane signed certifications for the 2011 Form 10-K. Defendant Yost signed certifications for the First Quarter of 2012 up to and including the First Quarter of 2015. Defendant McGrath signed certifications for the Third Quarter of 2015 up to and including the Third Quarter of 2016.

(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) *Designed such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures*, as of the end of the period covered by this report based on such evaluation; and

(d) *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter* (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and *I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) ***Any fraud, whether or not material, that involves***
> ***management*** or other employees who have a significant role
> in the registrant's internal control over financial reporting.

198.    The Company was later forced to admit that Defendant Miller and StoneMor's

CFO Defendants' statements in ¶¶ 196-197 were, in fact, false when made. Despite Defendants'

certifications that the internal controls over financial reporting were "designed . . . to provide

reasonable assurance regarding the reliability of financial reporting" and Defendants' conclusion

"that our disclosure controls and procedures were effective," StoneMor admitted on November 9,

2016 that it suffered a material weakness[24] over its internal controls over financial reporting at

least as of December 31, 2015. In fact, in the November 9, 2016 amended and restated Form 10-

K for fiscal year 2015, the Company admitted that "Based on this re-evaluation, the Chief

Executive Officer and the Chief Financial Officer concluded that our disclosure controls and

procedures were not effective as of December 31, 2015."   More specifically, the Company

disclosed that:

> As a result of this restatement, management identified deficiencies
> in our process and procedures that constitute material weaknesses
> in our internal control over financial reporting as follows:
>
> A. The Partnership did not design and maintain effective
> controls over establishing accounting policies nor did they
> periodically review them for appropriate application in the
> financial statements.
>
> B. The Partnership did not design and maintain effective
> controls over the review of certain recorded balances within
> "Deferred cemetery revenues, net," "Merchandise liability,"
> "Investment and other" revenues, "Cemetery property" and
> "Partners' Capital."

---

[24] According to StoneMor's November 9, 2016 Form 10-K: "A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis."

C. The Partnership did not design and maintain effective controls over the reconciliation of amounts recorded in the general ledger to relevant supporting details.

199. Deloitte LLP, Defendant's statutory auditor, seconded this material weakness determination, finding that: "In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Partnership has not maintained effective internal control over financial reporting as of December 31, 2015, based on the criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

200. Accordingly, contrary to their certifications, Defendants Miller and McGrath either: (1) recklessly failed to evaluate, in good faith, StoneMor's disclosure controls and procedures as claimed; or (2) knowingly provided false public assurances regarding StoneMor's absent financial reporting and disclosure controls and procedures.

## THE TRUTH EMERGES

201. In the long run, a company's distributions must eventually reflect its true underlying earnings and cash flows from operations. Unbeknownst to investors and in stark contrast to StoneMor's public statements, StoneMor was selling dilutive equity interests to fund artificially high cash payments to existing equity holders to forestall its distributions reflecting its true underlying earnings and cash flows from operations.

202. On October 27, 2016, after the market closed and prior to the issuance of the amended financial statements, StoneMor issued a press release entitled "StoneMor Partners L.P. Declares Temporary Reduction in Quarterly Cash Distribution and Provides Partnership Update." StoneMor cut its distribution *from $0.66 per unit to $0.33 per unit*.

203.   StoneMor's unit price reacted dramatically and immediately. StoneMor units fell from its $24.82 closing price on October 27, 2016 to $13.74 at the close of trading on October 28, 2016, a *loss of $11.08 per share, almost 45%*.

204.   The distribution cut occurred because StoneMor's access to the capital markets had been called into question in the wake of the announcement of a restatement. Throughout the Class Period, StoneMor used shelf offerings to sell its equity, and could continue to do so as long as StoneMor provided a contemporaneous prospectus with current, accurate financial results. So from September 9, 2016 onward, StoneMor could not sell its units through shelf offerings until ***after*** it issued amended financial statements correcting the material errors.

205.   Additionally, the At-the-Market shelf registration included a specific representation StoneMor could not provide concerning the issuance of financial statements. During the pendency of the restatement, StoneMor could not represent that its financial statements "present fairly in all material respects the financial condition, results of operations and cash flows of the Partnership" and that the "financial statements have been prepared in conformity with generally accepted accounting principles."

206.   Therefore, there were two reasons the restatement impaired StoneMor's ability to sell units to generate cash for distributions: (1) regulations required the Company to provide 16 months of accurate financial statements and (2) the At-the-Market agreement required a representation StoneMor could not give.

207.   Indeed, contrary to Defendants' public statements during the Class Period, the high level of the cash distribution was not based on "the strength of [the] business" nor was it primarily paid from operating cash flows. In reality, equity sales' net proceeds were used to pay down credit facility borrowings that directly funded the distributions; so, in effect, the unit sales

were used to pay artificially high distributions. After the announcement of the intention to restate, for the first time, StoneMor could not sell its common units to cover the difference between a typical $0.66 cash distribution per unit and the business' cash flow from operations.

208.    When the concealed risk materialized, the Defendants made a decision to preserve the value of their investments in StoneMor. For years, Defendants had reaped the benefits of running the Company with an overheated distribution engine (in that the illiquid company was not generating enough cash flow from operations to cover the high level of cash distributions). Defendants had received millions of dollars personally from their role in the fraud. But the overheated engine had finally sputtered out. By cutting the dividend, the Defendants delayed the death of StoneMor (and the full destruction of the value of their equity interests).

## ADDITIONAL INDICIA OF SCIENTER

209.    As alleged herein, Defendants acted with scienter in that each Defendant: (1) knew or was reckless in not knowing that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and/or omitted material information that was needed to make the statements made not misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

210.    Individual Defendants Hellman, Miller, McGrath, and Yost, because of their positions with the Company and the General Partner, possessed the power and authority to control the contents of StoneMor's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their

issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

211.    Moreover, because of their positions at StoneMor GP and ACII, Defendants Hellman, Miller and Shane, possessed, at all relevant times, the power and authority to control the distributions made by StoneMor, and the decisions related thereto.

212.    As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding StoneMor, their control over, and/or receipt and/or modification of StoneMor's allegedly materially misleading misstatements and omissions and/or their associations with the Company which made them privy to non-public information concerning StoneMor, participated in the wrongful scheme alleged herein.

**A.    Defendants Controlled the Public Equity Offerings**

213.    Defendants' control over the frequency, timing, and amount of the equity offerings supports a strong inference of scienter. The constant use of equity offerings to pay distributions was essential to StoneMor's ability to continue the fraud. Indeed, in their roles as officers and directors of StoneMor and StoneMor GP, Defendants were essential in both deciding the amount of the distribution and ensuring that the Company could pay for the distribution based on the amount of cash the Company had on hand. Defendants could not afford to pay the quarterly distributions from operations alone. Instead, Defendants chose to raise cash through the sale of additional units in order to fund the quarterly distribution.

214.    The choice to use equity to pay the distributions could have been made only by Defendants because only StoneMor's executive officers and directors had the ability to file and

sign the relevant documents necessary to offer additional units to the public. Moreover, Defendants did, in fact, sign and filed each of the SEC offering documents used to raise new equity to pay distributions during the Class Period. This supports a strong inference of scienter that the Defendants knew, or were reckless in not knowing that, the distributions were being paid from the proceeds of the equity offerings and not from operating revenues.

**B.    Defendants' Statements Support a Strong Inference of Scienter**

215.    As discussed above, Defendants spoke at length during the Class Period about the Company's intention to "***always continue to fund distributions from the business.***" Likewise, during the Class Period, Defendants regularly commented on the reliability and accuracy of its non-GAAP financials and inducing investors to rely on the Company's misleading non-GAAP financials: "We remove all of the arcane and bizarre deferral rules. And we try to show people exactly, 'Listen, this is the activity we did during the period. This is what we generated. These are the costs associated with that.' ***And that's why you can feel comfortable that we generate enough cash flow to pay a distribution in this period***.'"

216.    These false and misleading statements, and others like it, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about the true source of the cash distributions and the misleading nature of the non-GAAP financial statements. Accordingly, Defendants breached their duty under the federal securities laws by speaking on these topics and failing to fully disclose all relevant material information while doing so.

217.    During the Class Period, Defendants unequivocally denied that StoneMor used equity offerings to fund the distributions. For example, on June 2, 2016, StoneMor attended the 2016 Master Limited Partnership Association investor conference. During the conference, Defendant McGrath stated "***[p]eople say 'you raise equity to pay your distributions' and that***

*couldn't be further from the truth*. We look at the amount of equity we raised over the last three years compared to what we used that equity for which are acquisitions, contributions to our trust funds, and expansion capital expenditures. We'll see here that *every dollar went to fund those properties*."

218.    Further, StoneMor could not and did not pay the quarterly cash distributions from operating revenues, but rather relied on cash from equity offerings to fund the quarterly distributions. By denying that the quarterly distributions were paid from the equity offerings, Defendants either: (1) knew that, in substance, the distributions were paid using proceeds from the equity offerings; or (2) was reckless in not knowing or investigating that the Company paid for the quarterly distributions with proceeds from the equity offerings. Under either scenario, there is a strong inference that Defendants made these statements with scienter.

219.    A strong inference of scienter is bolstered by Defendants' purposefully evasive answers when they were asked specific questions by analysts related to the fraud, and when responding to "market activity," *i.e.* articles about the Company which suggested StoneMor was not paying its cash distributions from operations.

220.    For example, on July 27, 2012, the Company issued a press release entitled "StoneMor Partners L.P. Responds to Recent Market Activity" in reaction to an article from an analyst at Seeking Alpha criticizing the Company entitled "The Impending Explosion of StoneMor Partners" that was published a day earlier. The article questioned the sustainability of StoneMor's cash distribution payments, the source of those cash payments given the Company's weak cash flow, and the misleading non-GAAP accounting StoneMor was emphasizing over its GAAP accounting.

221.     Rather than address these questions head on, the Company's response in the July 27, 2012 press release simply restated the same story StoneMor had been telling for years. In the press release the Company claimed that "[b]y continuing to grow, the company has built up a net asset base that will continue to provide for liquidity well into the future" and "[w]ere StoneMor to satisfy all of its liabilities as of March 31, 2012, the company would still have more than $128 million in cash, 12,800 acres in cemetery land, perpetual care trusts with a value in excess of $250 million and 272 cemeteries and 76 funeral homes." The July 27, 2012 press release went on to state that "[t]he company provides [accounting] information on a production basis in order to allow the investor to understand the current sales activity and operating performance of the company."

222.     Following the press release, on August 7, 2012, StoneMor hosted the Q2 2012 earnings call. On the call, several analysts had questions about the Seeking Alpha article and the Company's response. Specifically, one analyst, Colin Stewart, asked Defendant Miller whether or not the Company's GAAP financials and cash flows would start to go up if the Company stopped aggressively marketing and selling pre-need contracts, *i.e.* asking to Defendants to explain why there was such a large difference between GAAP and non-GAAP figures. Rather than answer the question, Miller ushered the analyst off the line stating "pardon me" and "we're starting to get into just too much detail:"

> Timothy Yost: …We could back down our pre-need sales and turn the company into essentially a cash machine. It's just…
>
> Colin Stewart: Yeah, if you – just so I understand, if you did that, your GAAP operating profit would go up and your cash flow would go up, correct?
>
> Lawrence Miller: That's correct
>
> Colin Stewart: But would your adjusted operating profit [non-GAAP] go down…

>     Lawrence Miller: I really appreciate your interest in the company.
>     Pardon me.
>
>     Colin Stewart: Would your adjusted operating profit go down in
>     that instance?
>
>     Lawrence Miller: Look, now we're really – we're starting to get
>     into just too much detail. We appreciate your interest.

223.    Defendants' evasive response to a question that would otherwise have exposed the reason why their statements about source of the distributions and the misleading non-GAAP financial metrics were false, supports a strong inference that Defendants in fact were aware of the false and misleading nature of their statements when they were made.

## C.    Motive and Opportunity

224.    The motivation behind Defendants' scheme is simple: because of StoneMor's unique Master Limited Partnership structure, StoneMor answers to its General Partner, StoneMor GP. Under the terms of StoneMor's partnership agreement, ***the General Partner receives additional distributions*** when the Company issues distributions above a predetermined threshold. In other words, by ensuring the Company issues quarterly distributions in excess of $0.51/unit, the ***General Partner is able to increase the amount of money it receives.*** Not surprisingly, the chief architects of the scheme, Defendants Miller, Hellman, and Shane, serve as directors for both StoneMor ***and*** the General Partner, and are thus the chief beneficiaries of the scheme.

225.     Moreover, Defendant Hellman owned a significant portion of StoneMor common units himself and received a significant cash payout each time StoneMor made a quarterly distribution. During the Class Period, Defendant Hellman owned upwards of 2,274,531 StoneMor common units, entitling him to payments of ***as high as +$1,500,000 million, each quarter***. Importantly, because of his control person status over StoneMor GP, Defendant

Hellman, alone, decided whether or not he wanted to be paid millions of dollars each quarter or not.

226.   Therefore, Defendants Hellman, Miller, and Shane were motivated by their pecuniary interest to constantly raise distributions.

**D.   Former Executives' and Employees' Testimony Supports a Strong Inference of Scienter**

227.   Multiple accounts from former employees also support the inference Defendants knew that StoneMor was paying quarterly distributions with the proceeds from the equity offerings. These accounts support a strong inference of scienter.

228.   According to James Young, StoneMor was forced to keep issuing shares to keep up appearances that the Company had the money to fund the distribution. Likewise, Young recalled that after StoneMor acquired his Seawinds funeral home properties in 2013 (StoneMor paid for the properties with both units and cash), during a conversation with Ken Lee in mid-March, Young raised some concerns about the public offering of common units. Young had just received his units in February and told Lee they were watering down the stock. Lee replied "you want your dividends, don't you?" According to Young, he was not happy because the unit price dropped.

229.   These witness allegations add to the strong inference that Defendant's acted with scienter.

**E.   Corporate Resignations and Retirement**

230.   The timing and proximity of Defendants' resignations and/or retirement from StoneMor also supports an inference of scienter. Indeed, within six months of cutting the distribution in half, in a press release dated March 28, 2017, StoneMor announced:

> the Partnership's co-founder, Lawrence Miller, has decided to
> retire and will step down as Chairman, President and Chief

> Executive Officer of StoneMor GP, effective August 31, 2017, or earlier if a successor is appointed. Mr. Miller will remain an advisor to StoneMor GP and Vice Chairman of the Board following his retirement.

231.    Likewise, multiple StoneMor CFOs resigned from the Company during or immediately after the Class Period. This is especially indicative of scienter because the fraudulent conduct alleged herein necessarily involved the corporate responsibilities of the CFO such as, the issuing of new equity and the dissemination of misleading non-GAAP financial metrics.

232.    StoneMor went through no less than four CFOs or interim CFOs during the Class Period. Just after the beginning of the Class Period, on April 2, 2012, StoneMor announced that then CFO Defendant Shane would be retiring from his position as CFO. Taking his place would be Defendant Yost.

233.    Approximate three years later, on May 18, 2015, StoneMor announced that Defendant Yost "resigned as StoneMor's Chief Financial Officer and Secretary, effective May 13, 2015, in order to devote more time to personal and family matters." To take his place, StoneMor appointed James M. Pippis, Vice President of Accounting and Finance, to the role of Interim CFO.

234.    On September 28, 2015, StoneMor announced the appointment of Defendant Sean McGrath as the Company's CFO. However, Defendant McGrath's tenure was extremely short-lived. On January 23, 2017, less than a year and a half after being appointed, StoneMor announced that Defendant McGrath "resigned as Chief Financial Officer of StoneMor GP LLC[ ], the General Partner of the Partnership, to pursue business opportunities outside the deathcare industry."

235.    The resignations of StoneMor's CEO and two of its CFOs during the collapse of StoneMor's scheme or immediately following the Class Period further support a strong inference of their scienter.

**F.    Core Operations Doctrine**

236.    StoneMor's elaborate scheme to maximize StoneMor GP's profits was focused on two important aspects of the Company's business. First, the entire purpose of the Company was to maximize the amount of the quarterly distributions at all times. By increasing distributions, Defendants received a higher and higher portion of the overall distribution and lined their own pockets. Second, the only way Defendants were able to perpetrate the fraud was because of the Company's reliance on pre-need sales and aggressive acquisitions. This unconventional business plan allowed Defendants to explain away the Company's lack of cash flows and tout the success and sustainability of the Company based on misleading non-GAAP accounting metrics that made it impossible to fairly assess StoneMor as a company. Given the importance of the distributions to Defendants' personal bank accounts, it would be absurd to suggest that Defendants were simply unaware that the StoneMor was not paying the distributions from operating revenues but rather relying on equity offerings to pay the distributions.

237.    First and foremost, the quarterly distributions were the primary focus of both the Defendants and investors. Defendants regularly touted StoneMor's "distribution coverage" ratios and claimed that the Company had enough assets to cover years of distributions, knowing that investors valued the large quarterly dividends that were yielding close to a 9% return annually prior to the stock drop at the end of the Class Period. Moreover, the distributions were vital to Defendants own paychecks. As owners of StoneMor GP, Defendants stood to make a larger profit the higher the distribution went.

238.   Likewise, as considerable holders of StoneMor shares themselves, Defendants were certainly making millions of dollars each time the Company decided to issue the distributions at the same unaffordable level. Considering the fact that it was Defendants' decision to determine the distribution amount and to control the accounting related to the Company's operating revenues, it is inconceivable that Defendants were not aware of the use of equity offering proceeds to fund the distributions.

239.   Moreover, StoneMor's focus on pre-need cemetery sales was the perfect cover for Defendants to be able to disguise the fact that the Company was actually cash strapped. In light of the trusting and GAAP revenue recognition rules (*see* ¶¶ 70-72), StoneMor needed to follow when engaging in pre-need sales, the Company always had an excuse as to why the Company was not generating any cash flow. Instead, the Company distributed misleading and fabricated "critical financial measures" based on the supposed profitability of the Company's pre-need sales. To suggest that Defendants were simply unaware of the fact that their pre-need sales were not generating sufficient revenues to support the distributions is unfathomable.

240.   Because StoneMor's focus on pre-need cemetery sales was the most important part of Defendants' scheme to pay unaffordable distributions and profit wildly on the practice, it would be absurd to suggest that the Defendants were simply unaware that they were not funding the distributions from operating cash flows but rather from the capital markets.

## LOSS CAUSATION AND ECONOMIC LOSS

241.   The market prices of StoneMor common units were artificially inflated, or such artificial inflation was maintained, by the material misstatements and omissions alleged herein, including those set forth above in ¶¶ 128, 129, 133, 134, 137, 138, 141, 143, 145, 148, 150, 153, 155, 156, 159, 162, 163, 165, 167, 170, 172, 174, 176, 178, 179, 182, 184, 186, 189, 191, 192, 194, 196, 197.

242.     The artificial inflation in StoneMor common units was fully removed following the Company's publication of the post-closing October 27, 2016 press release after the market closed, which disclosed that StoneMor would be cutting its distribution by 50%. The press release explained, "[w]hile 3rd quarter 2016 results are not yet final, preliminary data has led the General Partner and the Board of Directors to temporarily reduce the quarterly cash distribution to $0.33 per unit." Defendant Hellman added:

> The General Partner strongly believes that this reduction, while disappointing, will protect and position the Partnership to achieve our longer-term expectations for future growth of the business. During this temporary transition period, the General Partner remains committed to providing necessary resources and support to the Partnership, including the funding of acquisitions that are immediately cash accretive, while it strengthens its sales force.

243.     The announcement revealed the materialization of the concealed risk that the Company would be unable to unable to pay the distribution, because it was not, as they had insisted, generated from business operations, but instead depended on access to capital markets to sell equity and then use the proceeds to pay down borrowings on the credit facility in order to pay the distribution. StoneMor's false and misleading statements as well as its omissions of material facts concealed this risk throughout the Class Period. StoneMor's October 27, 2016 announcement that it was slashing the quarterly cash distribution by 50% caused the prices of StoneMor common units to decline by material and statistically significant amounts, resulting to economic injury to Plaintiffs and other members of the Class.

244.     As a result of this news, the price of StoneMor units fell from its $25.14 closing price on October 27, 2016 to $13.74 at the close of trading on October 28, 2016, which constitutes a loss of $11.08 per share, almost 45%.

245.     As discussed below, analysts reacted to the news of the distribution cut by downgrading the units and dropping their price targets.

246.    For example, Janney reduced its "rating on the units to NEUTRAL from BUY, with a revised fair value estimate of $19 (was $30)" in its October 28, 2016 report following the distribution cut.

247.    Janney was not the only analyst that understood how the distribution cut affected the unit price. Wunderlich noted the impact of the distribution cut, and "[i]n order to preserve liquidity and ensure a safe level of distribution, the company has decided to temporarily reduce its quarterly distribution from $0.66 to $0.33. . . . [As a result], we are reducing our rating on STON shares from Buy to Hold and we are lowering our price target from $33 to $15."

248.    Similarly, the Motley Fool published an article entitled "A Deep Distribution Cut Guts StoneMor Partners L.P.," which noted that the decision to cut the distribution was driven by "the company's third-quarter results, which while not yet finalized, led the company to the conclusion that it needed to cut the payout."  The article noted that "Units of StoneMor Partners (NYSE:STON) are getting thrashed on Friday morning, down more than 44% by 11:15 a.m. EDT, after the Company temporarily cut its distribution in half."

**INDIVIDUAL DEFENDANT AND CONTROLLING PERSON ALLEGATIONS**

249.    During the Class Period, Defendants Miller, Hellman, Shane, Yost and McGrath, as senior executives and/or directors of StoneMor, StoneMor GP and ACII, were privy to confidential and proprietary information concerning the Company and its operations and at all relevant times controlled StoneMor and StoneMor GP through various subsidiaries. Defendants Miller, Hellman, Shane, Yost and McGrath similarly had access to undisclosed information about, among other things, StoneMor's practice of issuing equity in order to fund distributions and use of misleading non-GAAP financial metrics. Defendants Miller, Hellman, Shane, Yost and McGrath ascertained such information through StoneMor's internal corporate documents, conversations, and connection with each other and with corporate officers, employees,

attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as StoneMor, StoneMor GP, GP Holdings and ACII's officers and directors.

250.   Defendants Miller, Hellman, Shane, Yost and McGrath participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and knew, or recklessly disregarded, that there were material misstatements and omissions contained therein. As a result of their executive or managerial positions within StoneMor, Defendants Miller, Hellman, Shane, Yost and McGrath had access to adverse undisclosed facts that StoneMor was funding its quarterly distributions with the proceeds from equity offerings and disseminating misleading non-GAAP financial metrics, and knew that these adverse undisclosed facts rendered the positive representations made by or about StoneMor and its business, or adopted by the Company, materially false and misleading.

251.   Defendants Miller, Hellman, Shane, Yost and McGrath because of their positions of authority and control as officers or directors of the Company, were able to, and did in fact, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Defendants Miller, Hellman, Shane, Yost and McGrath were each provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Accordingly, Defendants Miller, Hellman, Shane Yost and McGrath are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations alleged herein.

252.    As senior executive officers and/or directors and as controlling persons of a publicly held company whose common units are registered with the SEC pursuant to the Exchange Act, and are traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Miller, Hellman, Shane, Yost and McGrath each had a duty to promptly disseminate accurate and truthful information with respect to, among other things, StoneMor's use of equity offerings to fund the Company's quarterly cash distributions and their misleading use of non-GAAP financial metrics to disguise the Company's lack of cash flow from operations. Defendants Miller, Hellman, Shane, Yost and McGrath had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based on truthful and accurate information. Defendants Miller, Hellman, Shane, Yost and McGrath's material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

253.    Throughout the Class Period, StoneMor claimed that the Company was being run by the directors and officers of the cemetery and funeral home organization known as StoneMor Partners L.P. and StoneMor GP, LLC. In reality, the Company was controlled by a complex web of corporate entities and partnerships with various classes of shares and voting rights, all of which had one very important underlying fact in common − they were ultimately controlled by Defendants Hellman, Miller and Shane. At all relevant times, Defendants Hellman, Miller and Shane were ultimately the puppet master of StoneMor and benefitted financially from all of the decisions effectively made by him through his control of StoneMor GP, related to the Company's quarterly cash distributions.

254.    While StoneMor carefully obscured the means by which Hellman, Miller and Shane controlled the Company, StoneMor's SEC filings show that, at all relevant times during the Class Period, Defendant Hellman, or an entity Defendants Hellman, Miller and Shane controlled, were effectively controlling the Company, including its decision to make distributions. Taken together with the allegations above, that StoneMor was using cash from new equity offerings to pay the quarterly distributions, this scheme essentially allowed Defendant Hellman, Miller and Shane to funnel money from unknowing new investors into his own pocket.

255.    At the beginning of the Class Period, Defendant Hellman controlled StoneMor through a chain of phantom and shell entities, beginning with his controlling interest in a LLC known as CFSI LLC ("CFSI"). CFSI owned 100% of StoneMor's General Partner, StoneMor GP which allowed Hellman to control the major decisions StoneMor made during the Class Period.[25] Indeed, according to StoneMor's SEC filings:

> CFSI LLC, through its direct control of our General Partner and its indirect control of us and our subsidiaries, [] prevent us, our subsidiaries and our General Partner from taking certain significant actions without the approval of CFSI LLC. These actions include:
>
> - certain acquisitions, borrowings and capital expenditures by us, our subsidiaries or our General Partner;
>
> - issuances of equity interests in us or our subsidiaries; and
>
> - certain dispositions of equity interests in, or assets of, us, our General Partner or our subsidiaries.

---

[25] 100% of the class B units were owned by: Defendant Miller (30%); Defendant Shane (30%); Former Senior Vice President and Chief Operating Officer, Michael L. Stache (M. Stache) (20%); and Former Senior Vice President of Sales, Robert Stache ("R. Stache") (20%). According to StoneMor's Form 10-K, filed on March 15, 2012, "[t]he Class B units in the aggregate are entitled to 50% of all quarterly cash distributions that we pay to our General Partner with respect to its General Partner interest and 25% of all quarterly cash distributions that we pay to our General Partner with respect to its incentive distribution rights.

256.    In turn, CFSI was directly owned by an entity known as Cornerstone Family Services LLC ("CFS") through a majority ownership stake.[26]  CFS was, in turn, owned by the MDC IV Liquidating Trusts[27] ("MDC IV") through a majority ownership stake.[28]  MDC IV is controlled by a separate entity called Gen4 Trust Advisor LLC ("Gen 4 Trust") and Defendant Hellman is the sole member of Gen 4 Trust.

257.    In simple terms, Defendant Hellman controlled Gen 4 Trust, which controlled CFS, which controlled CFSI, which controlled StoneMor GP and StoneMor GP stood to receive a substantial financial benefit if StoneMor paid larger and larger quarterly cash distributions.

258.    On May 19, 2014, StoneMor issued a press release entitled "StoneMor Partners L.P. Announces $130 Million Commitment by Private Investment Firm."  According to the press release, "American Infrastructure MLP Funds ("AIM"), a private investment firm, has committed up to $130 million of capital to the company and its General Partner, ***including acquiring an indirect majority interest in the General Partner of the company***."

259.    However, AIM's acquisition of a majority interest in StoneMor GP accomplished only one thing, it changed the names of the Hellman-controlled entities that were in control of StoneMor's operations. Indeed, as the May 19, 2014 press release concedes:

> AIM's investment in the General Partner will be managed by Bob Hellman, Jr., its founder and CEO, who is also an existing director of the General Partner. Mr. Hellman also serves as trustee of a trust

---

[26] CFS owns 85% of CSFI. The remaining 15% stake in CFSI was owned by: (1) MDC IV (10.1%); (2) Defendant Miller (1.2%); (3) Defendant Shane (1.2%); and (4) other directors and officers (<1% each).

[27] The MDC IV Liquidating Trusts are: (1) MDC IV Trust U/T/A November 30, 2010, (2) MDC IV Associates Trust U/T/A November 30, 2010, and (3) Delta Trust U/T/A November 30, 2010.

[28] MDC IV owns 89.9% of CFS. The remaining 90.1% was owned by: (1) institutional investors (5.3%); (2) Defendant Miller (1.6%); (3) Defendant Shane (1.6%): and (4) other individuals (<1% each).

for the sole benefit of an AIM affiliated entity. ***In his capacity as trustee, he has <u>retained</u> all voting and investment power over the investment, and may therefore be <u>considered a control person</u> of the General Partner <u>before and after</u> this new investment.***

260.    What the May 19, 2014 announcement did not disclose, however, was that AIM was not the actual party acquiring an indirect majority interest in StoneMor GP. Instead, the acquirer was affiliate of AIM, ACII.[29]

261.    As part of the reorganization created by the acquisition, StoneMor GP became a wholly owned subsidiary of a newly named entity called StoneMor GP Holdings LLC ("GP Holdings") and formerly known as, CFSI (the Hellman-controlled company described above that owned 100% of StoneMor GP). In turn, and as a result of the acquisition, the majority interest in GP Holdings was now controlled by ACII.[30]

262.    ACII is ***controlled*** by Defendant Hellman as trustee of a trust established for the sole benefit of ACII. As trustee, Defendant Hellman controls all voting and investment power over ACII. ACII is ***managed*** solely by AIM Universal Holdings LLC ("AUH"), which is run by three managing members: Defendant Hellman, Judy Bornstein and Matthew Carbone, who are all current managing directors at Hellman's company, AIM.

263.    ACII is separately ***owned*** by a consortium of Hellman-controlled entities including: American Infrastructure MLP Fund II, L.P. ("AIM II"); American Infrastructure MLP Founders Fund II, L.P. ("AIM FFII"); and AIM II Delaware StoneMor, Inc.("AIM II StoneMor"). AIM II StoneMor is in turn owned by: American Infrastructure MLP Management II, L.L.C. ("AIM Management II") and AIM II Offshore, L.P. ("AIM II Offshore"). Defendant

---

[29] According to Defendants' SEC filings, ACII is an affiliate of American Infrastructure Funds, LLC., whose managing member is Defendant Hellman.

[30] ACII owns a 67.03% of GP Holdings. The remaining 32.97% stake in GP holdings was owned by: Defendant Miller, Defendant Shane, Allen Freedman, M. Stache, R. Stache, Martin Lautman, and two family partnerships affiliated with Defendants Miller and Shane.

Hellman controls all of these entities. He is the President of AIM II StoneMor and is the managing member of AIM Management II, which is the general partner of, and therefore controls, AIM II, AIM FFII, and AIM II Offshore.

264.   In other words, ACII, the entity that purchased an indirect majority interest in StoneMor GP, is **controlled, managed, and owned** by Defendant Hellman or entities he controls. This gave Defendant Hellman the power to directly control StoneMor's operations and provided him with the ability to make the Company pay distributions that were to his own pecuniary benefit.

265.   As a result, Defendant Hellman Miller and Shane (and the various entities they controlled) controlled StoneMor throughout the Class Period and therefore culpably participated in the fraud. Indeed, during the 2014 Investor Day, Defendant Miller confirmed that AIM's investment was an integral part of StoneMor's ability to continue business operation into the future: "part of the AIM investment . . . actually does help that because now we have a sponsor. . . . **We now have a significant deep pocket[s] that's there to support the growth of the company and to allow us to achieve our goals**."

### PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

266.   At all relevant times, the market for StoneMor's common units was an efficient market for the following reasons, among others:

(a)   StoneMor's common units met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)   StoneMor communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits

of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     StoneMor was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     unexpected material news about StoneMor was reflected in and incorporated into the Company's unit price during the Class Period.

267.    As a result of the foregoing, the market for StoneMor's common units promptly digested current information regarding StoneMor from all publicly available sources and reflected such information in StoneMor's unit price. Under these circumstances, all purchasers of StoneMor's common units during the Class Period suffered similar injury through their purchase of StoneMor's common units at artificially inflated prices, and a presumption of reliance applies.

268.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR; BESPEAKS CAUTION IS NOT APPLICABLE

269.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

270.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

271.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of StoneMor who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

272.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) individually and on behalf of all other persons and entities that, during the period from March 15, 2012 through October 27, 2016, inclusive, purchased or otherwise acquired the publicly traded common units of StoneMor and were damaged thereby. Excluded from the Class are: Defendants; present and former officers of StoneMor; members of StoneMor's Board of Directors; members of the immediate family (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)) of any excluded person; any entities in which Defendants have or had a controlling interest; any subsidiary or affiliate of StoneMor;

StoneMor's employee retirement or benefit plan(s) and the participants in such plan(s), and their beneficiaries, to the extent they purchased through such a plan; and the legal representatives, heirs, successors, or assigns of any of the foregoing excluded individuals and entities.

273.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, StoneMor securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by StoneMor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

274.    As of November 1, 2016, soon after the end of the Class Period, there were approximately 35.5 million shares of the Company's common units outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

275.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

276.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

277.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of StoneMor;

(c)    whether Defendants caused StoneMor to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of StoneMor's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

278.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Defendants StoneMor, Miller, Shane, Yost, and McGrath Violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder

279.   Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

280.   This Count is brought against StoneMor and the Individual Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §§78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of Plaintiffs and all other members of the Class.

281.   During the Class Period, StoneMor and the Individual Defendants, while in possession of material adverse, non-public information, disseminated or approved the false or misleading statements and/or omissions specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282.   Defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other Class members in connection with their purchases of StoneMor units during the Class Period.

283.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to StoneMor's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's units would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

284.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members have suffered damages in connection with their respective purchases and sales of StoneMor units during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for StoneMor units and experienced loses when the artificial inflation was released from StoneMor units as a result of the revelations and unit price decline detailed herein. Plaintiffs and the other Class members would not have purchased StoneMor units at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

285.    By virtue of the foregoing, StoneMor and the Individual Defendants have each violated Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

**Defendants StoneMor GP, GP Holdings, ACII, and the Individual Defendants Violated Section 20(a) of the Securities Exchange Act**

286.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

287.   This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against StoneMorGP, GP Holdings, ACII, and the Individual Defendants (the "Section 20(a) Defendants") on behalf of Plaintiffs and all other members of the Class

288.   During the Class Period, each of the Section 20(a) Defendants was a controlling person of StoneMor within the meaning of Section 20(a) of the Exchange Act, as each of the Section 20(a) Defendants performed all management functions and conducted and directed the Company's day-to-day operations.

289.   By reason of their high-level positions at StoneMor and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants, together with StoneMorGP, GP Holdings, and ACII, had the power to influence and control and did influence and control, directly or indirectly, the day-to-day decision-making of the Company and its executives, including the content and dissemination of the various statements that Plaintiffs contend were materially false or misleading. The Individual Defendants and StoneMorGP, GP Holdings, and ACII exercised day-to-day control over the Company and had the power and authority to cause StoneMor to engage in the wrongful conduct complained of herein. In this regard, StoneMorGP, GP Holdings, ACII, and the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

290.     StoneMorGP, GP Holdings, ACII, and each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period. Accordingly, StoneMorGP, GP Holdings, ACII, and each of the Individual Defendants was a culpable participant in the underlying violations of Section 10(b) alleged herein.

291.     As alleged herein, StoneMor violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons and, as a result of their own aforementioned conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as StoneMor is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired StoneMor common units during the Class Period at artificially inflated prices.

292.     As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of StoneMor common units during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: April 24, 2017                    By:

Naumon A. Amjed (PA 309520)
Ryan T. Degnan (PA 309305)
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com

*Liaison Counsel for the Proposed Class*

James W. Johnson (*admitted pro hac vice*)
Michael H. Rogers (*admitted pro hac vice*)
Matthew J. Hrutkay (*admitted pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
mhrutkay@labaton.com

*Counsel for Lead Plaintiffs Fremont Investor Group
and the Proposed Class*

106

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2017, a true and correct copy of the foregoing was hand delivered to the Clerk of the Court to be electronically filed, will be available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) and electronic mail upon all counsel of record.

Naumon A. Amjed